75 P.3d 1191

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Dennis MATIAS, Defendant–Appellant,**

and

**Ernest Apao, Jr., Defendant.**

**No. 25001.**

Supreme Court of Hawai'i.

Sept. 4, 2003.

Emlyn H. Higa, on the briefs, for the defendant-appellant, Dennis Matias.

Mangmang Qiu Brown, deputy prosecuting attorney, on the briefs, for the plaintiff-appellee, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Dennis Matias appeals from the judgment of the first circuit court, the Honorable Karen S.S. Ahn presiding, filed on February 25, 2002, convicting him of and sentencing him for the following offenses: (1) place to keep pistol or revolver, in violation of Hawai'i Revised Statutes (HRS) §§ 134–6(c) and (e) (Supp.2000) (Count I); [1] (2) ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes, in violation of HRS §§ 134–7(b) and (h) (Supp.2000) (Count II); [2] (3) promoting a dangerous drug in the third degree, in violation of HRS § 712–1243 (1993 & Supp.2000) (Count III); [3] and (4) unlawful use of drug paraphernalia,

1. HRS § 134–6 provides in relevant part:

**Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.**

. . . .

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

. . . .

(e) Any person violating . . . this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. . . .

2. HRS § 134–7 provides in relevant part:

**Ownership or possession prohibited, when; penalty.**

. . . .

(b) No person who . . . has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm therefor.

. . . .

(h) Any . . . felon violating subsection (b) shall be guilty of a class B felony.

3. HRS § 712–1243 provides:

**Promoting a dangerous drug in the third degree.** (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

(2) Promoting a dangerous drug in the third degree is a class C felony.

(3) Notwithstanding any law to the contrary, if the commission of the offense of promoting a dangerous drug in the third degree under this section involved the possession or distribution of methamphetamine, the person convicted shall be sentenced to an indeterminate term of imprisonment of five years with a mandatory minimum term of imprisonment, the length of which shall be not less than thirty days and not greater than two-and-a-half years, at the discretion of the sentencing court. The person convicted shall not be eligible for parole during the mandatory period of imprisonment.

in violation of HRS § 329–43.5(a) (1993) (Count IV).[4] On appeal, Matias contends that: (1) HRS § 706–662 (Supp.2001), Hawai'i's extended term sentencing statute, is unconstitutional in light of the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (2) Matias was denied the effective assistance of counsel because trial counsel (a) failed to call a critical witness and (b) failed to join codefendant Ernest Apao's motion to sever his trial from Matias's; and (3) the circuit court plainly erred in failing to instruct the jury regarding the possible merger of Counts I and II, pursuant to HRS § 701–109(1)(e) (1993).[5] We agree with Matias that the circuit court plainly erred in failing to instruct the jury, pursuant HRS § 701–109(1)(e), as to the possible merger of Counts I and II. Accordingly, we vacate the circuit court's judgment of conviction and sentence with respect to Counts I and II and remand this matter to the circuit court for a new trial.

## I. BACKGROUND

The following evidence was adduced at Matias's jury trial, which commenced on July 10, 2001 and concluded on July 13, 2001. On or about March 6, 2001, Dan Aihuna reported to the Honolulu Police Department (HPD) that his residence had been burglarized and that he suspected Mafia Makaila of having committed the offense. On March 7, 2001, Ave Kepa, Ernest Apao, and Makaila drove to the residence of Mike Butenbah, a friend of Aihuna, to confront Aihuna; Aihuna, however, was not present. When the confrontation escalated, Butenbah phoned Joseph Sylva, a mediator with the Neighborhood Justice Center and a martial arts expert with whom Butenbah trained, and requested Sylva's assistance in mediating the "heated" conflict at his residence. Butenbah explained that Makaila and others were threatening him at his residence and that he suspected that Makaila had burglarized Aihuna's home the previous day.

At approximately 6:00 p.m., Sylva arrived at Butenbah's home, located in Waimnalo, City and County of Honolulu. Upon arriving, Sylva encountered Kepa, who had parked his vehicle across the street from Butenbah's residence. Sylva also recognized two passengers—Apao and Makaila—inside Kepa's vehicle. Sylva observed Kepa exit his vehicle in an effort to prevent a physical altercation between Apao and Makaila, on the one hand, and Butenbah, on the other. Kepa temporarily diffused the situation, persuading Apao and Makaila to leave the premises. As Kepa walked toward his vehicle, however, he exposed "a black handle handgun ... under his aloha shirt." Sylva followed the men to Kepa's vehicle, at which point he observed the "handle of a handgun sticking out of [Makaila's] pants waistband." Sylva also noticed what appeared to be a pistol handle "sticking out [of Apao's] waistband." "Scared for [his] life," Sylva phoned his brother-in-law, HPD Sergeant John McCarthy, for advice. Sylva then drove to his workplace, an auto body shop in Kailua.

At approximately 8:30 p.m., Sylva returned to Butenbah's home. Soon thereafter, Kepa again appeared at the scene with Makaila; Apao followed Kepa in his vehicle, accompanied by Matias in the front passenger seat.

---

4. HRS § 329–43.5(a) provides:

**Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

5. HRS § 701–109 provides in relevant part:

**Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense, if:

. . . .

(e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

Sylva testified that Kepa's demeanor had changed since the prior 6:00 p.m. incident. Kepa appeared "very agitated," and Sylva "could smell the stench of alcohol on his breath." Kepa lifted up his shirt, showed Sylva a gun, and stated, "People gonna die, this is gonna blow up." Sylva pleaded with Kepa to resolve the conflict peacefully, but Kepa refused. Sylva then approached Apao's vehicle, inquiring whether they could "come to some kind of diplomatic resolution[.]" Matias tersely rejected Sylva's proposal and, like Kepa, stated that "people gonna die." As Matias "lift[ed] up his shirt," Sylva "observed a handle sticking out of Matias's waistband." Sylva walked away from Apao's vehicle to speak again with Kepa in an effort to resolve the situation; Kepa informed Sylva that there would be no resolution to the matter. Sylva immediately phoned Sergeant McCarthy a second time for assistance.

Within minutes, approximately five HPD vehicles arrived at the scene. Apao attempted to flee, but a police vehicle had blocked the roadway, preventing him from maneuvering his vehicle. Sylva informed HPD Officer Jonathon Carreiro that both Apao and Matias had handguns in their possession. Officer Carreiro approached the passenger side of the vehicle and observed Matias "playing" with a latex glove; when Officer Carreiro inquired what Matias was doing with the glove, Matias "threw it into the glove box and shut the glove box." [6] Matias then "started doing furtive movements" under his seat; he appeared to be "scrambling under the seat to maybe hide something or grab something." Officer Carreiro demanded that Apao and Matias exit the vehicle.

As Matias exited the vehicle, Officer Carreiro "observed a handgun on the passenger side floor area right in front of the seat," which experts subsequently identified as a

loaded .22 caliber semiautomatic Ruger pistol. Another police officer recovered a handgun from Apao's driver's seat. Officer Carreiro immediately demanded that both men lay on the ground and thereafter searched both men for weapons. Although Officer Carreiro found no weapons on Apao's or Matias's bodies, he recovered a "crystal pipe" from Matias's left pocket, which contained a "crystal-like substance inside the pipe." [7] Officer Carreiro arrested Matias; HPD Officer Kenneth Tjomsland arrested Apao.

On March 19, 2001, Matias was charged by complaint with the following offenses: (1) place to keep pistol or revolver (Count I), see supra note 1; (2) ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes (Count II), see supra note 2; (3) promoting a dangerous drug in the third degree (Count III), see supra note 3; (4) unlawful use of drug paraphernalia (Count IV), see supra note 4; and (5) terroristic threatening in the first degree (Count V), in violation of HRS § 707–716(1)(d) (1993).[8] The complaint also charged Apao with terroristic threatening in the first degree (Count VI), see supra note 8.

At trial, the parties stipulated that Matias was a convicted felon at the time of the subject incident and that he was cognizant that, as a convicted felon, he was prohibited from owning, possessing, or controlling any firearm or ammunition. The parties further stipulated that Matias did not have a license issued by the City and County of Honolulu to carry a pistol, revolver, or ammunition.

At trial, Matias testified on his own behalf as follows. He went to Apao's residence so that Apao could drive him to his girlfriend's home. As Matias entered Apao's vehicle, Kepa and Makaila arrived and engaged in a conversation with Apao; Matias claimed that he was unaware of the subject of their con-

---

**6.** Officer Carreiro testified that handling a weapon with a latex glove could affect the transferability of fingerprints onto the weapon.

**7.** Hassan Mohamed, a forensic chemist with the HPD, performed a chemical and physical analysis of the glass pipe and its contents and determined that "the contents were 0.331 grams of an off-white brownish substance containing methamphetamine."

**8.** HRS § 707–716(1)(d) provides:

> **Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
>
> . . . .
>
> (d) With the use of a dangerous instrument.

versation. To Matias's surprise, Apao followed Kepa to Butenbah's residence, and Matias observed Kepa "jump out of the car[,] ... talk[ ] to some of the guys there, and the next thing you know, about two minutes later[,] the cops was coming up the street."

Matias denied that he threatened Sylva with a weapon. Matias, however, acknowledged that he was "playing with [a latex] glove" and that he found the glove on the front seat of Apao's vehicle. With respect to the "furtive movements" observed by Officer Carreiro, Matias testified that he "was trying to get rid of [his] pipe," which, by his own admission, contained methamphetamine. With respect to the handgun recovered by the police, Matias stated that he "had no knowledge of the gun, and that's not [his] gun."

On July 13, 2001, the jury found Matias guilty of Counts I, II, III, and IV; the jury acquitted Matias of Count V and Apao of Count VI. On August 31, 2001, the prosecution filed a motion for an extended maximum term of imprisonment, pursuant to HRS §§ 706–662(1) and (4)(a), requesting that Matias be sentenced as a "persistent offender" and a "multiple offender." On September 5, 2001, the prosecution filed a motion for a mandatory minimum term of imprisonment, pursuant to HRS § 706–660.1(3) (1993), for the use of a firearm during the commission of a felony in connection with Count I. The circuit court granted the prosecution's motions and sentenced Matias as follows:

> Okay. All right, ... everything before me show[s] that Mr. Matias ... ha[s] a long record.
>
> In Counts I and II, grant the Motion for Mandatory Sentencing and the Motion for Extended Term.
>
> In Counts I and II[,] 20 years each in jail.
>
> In Count I, mandatory minimum ten years.
>
> All concurrent.

> I will grant the Motion for Extended [terms of imprisonment] based upon the fact that you are a multiple offender.
>
> Counts III and IV[,] ten years each[, with a] mandatory minimum [of] 30 days in Count III.
>
> All concurrent[,] all with credit for time served.
>
> Mittimus to issue forthwith.

On March 18, 2002, the circuit court filed its findings of fact, conclusions of law, and order granting the prosecution's motion for an extended maximum term of imprisonment.[9] On March 22, 2002, Matias filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Plain error

■ " 'We may recognize plain error when the error committed affects substantial rights of the defendant.' " *State v. Cordeiro*, 99 Hawai'i 390, 405, 56 P.3d 692, 707, *reconsideration denied*, 100 Hawai'i 14, 58 P.3d 72 (2002) (quoting *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (quoting *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997))). *See also* HRPP Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

### B. Jury instructions

■ When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading....

> [E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the

9. We note that, during the extended term sentencing hearing, the circuit court did not make an oral finding that an extended term of imprisonment was "necessary for protection of the public." In its written findings of fact, conclusions of law, and order, however, the circuit court expressly found that Matias's "commitment for an extended term [wa]s necessary for the protection of the public."

entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that the error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. . . .

*State v. Valentine*, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (citations and internal quotation signals omitted) (brackets in original).

*Cordeiro*, 99 Hawai'i at 403, 56 P.3d at 705 (quoting *State v. Valdivia*, 95 Hawai'i 465, 471–72, 24 P.3d 661, 667–68 (2001)).

## III. *DISCUSSION*

■ Matias contends that the circuit court plainly erred in failing to instruct the jury, pursuant to HRS § 701–109(1)(e), *see supra* note 5, that, in order to convict Matias of both the offense of place to keep pistol or revolver (Count I), *see supra* note 1, and the offense of ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes (Count II), *see supra* note 2, the jury was required to find that Matias acted with "separate and distinct intents" with respect to Counts I and II. Matias contends that Counts I and II each charge him with "possession of a firearm" and that the prosecution relied upon the same factual circumstances to prove each count in its case-in-chief. Matias asserts that "[i]f, in the 9:00 p.m. incident, the jury finds that [he] had a single objective to possess the subject handgun, then there can only be one conviction." On the other hand, Matias concedes that, "[i]f the jury finds that, in the 9:00 p.m. incident, [he] had two separate objectives that conformed, nevertheless, to the elements of Counts I and II, then he could be convicted of each." The prosecution counters that, because the circuit court "specifically instructed the jury as to the requisite state of mind applicable to each offense," the jury, having returned a guilty verdict as to Counts I and II, "must have found [that

Matias] not only had the distinct intent in Count I, to carry or possess the subject handgun without a license in a non-enclosed container in an impermissible place, but he also had the separate intent in Count II, to possess or control the subject handgun as a convicted felon." We disagree with the prosecution and agree with Matias.

■ HRS § 701–109(1)(e), *see supra* note 5, interposes a constraint on multiple convictions arising from the same criminal conduct. The statute "reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal[.]" *See* Commentary on HRS § 701–109.

Whether a course of conduct gives rise to more than one crime [within the meaning of HRS § 701–109(1)(e) ] depends in part on the intent and objective of the defendant. The test to determine whether the defendant intended to commit more than one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. Where there is one intention, one general impulse, and one plan, there is but one offense. *All factual issues involved in this determination must be decided by the trier of fact.*

*State v. Hoey*, 77 Hawai'i 17, 27 n. 9, 881 P.2d 504, 514 n. 9 (1994) (quoting *State v. Alston*, 75 Haw. 517, 531, 865 P.2d 157, 165 (1994) (brackets in original)) (emphasis added); *see also State v. Apao*, 95 Hawai'i 440, 445, 24 P.3d 32, 37 (2001) (quoting *State v. Arceo*, 84 Hawai'i 1, 18, 928 P.2d 843, 860 (1996)); *State v. Ganal*, 81 Hawai'i 358, 379, 917 P.2d 370, 391 (1996) (quoting *State v. Castro*, 69 Haw. 633, 653, 756 P.2d 1033, 1047 (1988)). HRS § 701–109(1)(e), however, does not apply where a defendant's actions constitute separate offenses under the law. *See State v. Hoopii*, 68 Haw. 246, 251, 710 P.2d 1193, 1197 (1985).

In the present matter, the jury convicted Matias of place to keep pistol or revolver (Count I), *see supra* note 1, and ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes (Count II), *see supra* note 2. Unques-

tionably, "possess[ion of] an object," which, as an attendant circumstance, "exhibit[s] the attributes of a firearm," constituted the conduct element of both Counts I and II. *See State v. Valentine*, 93 Hawai'i 199, 207, 998 P.2d 479, 487 (2000); *see also State v. Momoki*, 98 Hawai'i 188, 194, 46 P.3d 1, 7 (App. 2002) ("In order for [HRS § 701–109(1)(e)] to be implicated, the 'same conduct' must establish an element of both offenses."). Equally clear is that the evidence upon which the jury based its guilty verdicts in Counts I and II arose out of the same factual circumstances—*i.e.*, the 9:00 p.m. incident during which Officer Carreiro recovered a firearm from the passenger seat inside Apao's vehicle, which Matias occupied in the course of the incident. Accordingly, HRS § 701–109(1)(e), *see supra* note 5, applied to the present matter.[10]

Inasmuch as the question whether Matias's conduct constituted " 'separate and distinct culpable acts' or an uninterrupted continuous course of conduct," *Apao*, 95 Hawai'i at 447, 24 P.3d at 39 (emphasis omitted), was one of fact that should have been submitted to the jury, we hold that the circuit court's instructions, which conspicuously omitted therefrom any instruction regarding the possible merg-

er of Counts I and II, pursuant to HRS § 701–109(1)(e), were prejudicially insufficient and, therefore, plainly erroneous.[11]  *See Alston*, 75 Haw. at 529, 865 P.2d at 164 ("We have recognized that [plain] error occurs when the trial court's instructions to the jury fail to preclude the return of guilty verdicts which violate the statutory mandate of HRS § 701–109."); *State v. Ah Choy*, 70 Haw. 618, 623, 780 P.2d 1097, 1101 (1989) (holding that, pursuant to HRS § 701–109(1)(e), the circuit court plainly erred in failing to instruct the jury that the defendant could be convicted only of attempted murder if committed concurrently with first degree robbery).[12]

## IV. CONCLUSION

Based on the foregoing analysis, we vacate the circuit court's judgment of conviction and sentence in Counts I and II and remand this case for a new trial.

---

10. Correlatively, it is common-sensical that a defendant charged in connection with the same incident with the offenses of place to keep pistol or revolver (Count I) and ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes (Count II) would, in virtually every instance, be entitled to a merger instruction, pursuant to HRS 701–109(1)(e), because both offenses would intrinsically arise out of the same conduct and attendant circumstances.

11. The circuit court's error was particularly prejudicial to Matias, insofar as Matias's convictions of Counts I and II provided the basis for the prosecution's motion for extended term sentencing as a "multiple offender," pursuant to HRS § 706–662(4)(a), which the circuit court granted. *See supra* section I.

12. This court's recent decision in *State v. Kaua*, 102 Hawai'i 1, 13, 72 P.3d 473, 485 (2003), which sustained an *Apprendi* challenge of the constitutionality of HRS § 706–662 under both

the United States and Hawai'i Constitutions, disposes of Matias's first point of error.

Matias's arguments in support of his second point of error are without merit. First, defense counsel's failure to call Apao's girlfriend as a defense witness did not constitute ineffective assistance of counsel, inasmuch as "the calling of witnesses is generally a strategic decision for defense counsel" and, consequently, will not be second-guessed on appeal. *State v. Richie*, 88 Hawai'i 19, 39–40, 960 P.2d 1227, 1247–48 (1998) ("[M]atters presumably within the judgment of counsel, like trial strategy, will rarely be second-guessed by judicial hindsight.") (Citations and internal quotation signals omitted). Second, because the jury acquitted both Apao and Matias of the offense of terroristic threatening in the first degree (Counts V and VI), Matias could have suffered no harm as a result of defense counsel's failure to join Apao's motion to sever the trials.