164 P.3d 765

STATE of Hawai'i, Plaintiff–Appellee,

v.

Robert Anthony PADILLA, Defendant–Appellant.

No. 27300.

Intermediate Court of Appeals of Hawai'i.

July 6, 2007.

As Corrected Aug. 16, 2007.

Chester M. Kanai, on the briefs, Honolulu, for Defendant–Appellant.

Sonja P. McCullen, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, Chief Judge, WATANABE, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Robert Anthony Padilla (Padilla) appeals from the Judgment filed on March 16, 2005, in the Circuit Court of the First Circuit.[1] Padilla was indicted on the following offenses: Count 1—first degree reckless endangering for intentionally firing a semi-automatic firearm in a manner which recklessly placed Preston Baltazar (Baltazar) in danger of death or serious bodily injury; Count 2—first degree reckless endangering for intentionally firing a semi-automatic firearm in a manner which recklessly placed Sterling Mahelona (Mahelona) in danger of death or serious bodily injury; Count 3—felon in possession of a firearm or ammunition; Count 4—place to keep a loaded pistol or revolver; and Count 5—promoting a dangerous drug in the second degree for possessing one-eighth ounce or more of a substance containing methamphetamine. After a jury trial, Padilla was found guilty of Counts 3 and 4, the felon-in-possession and

---

1. The Honorable Michael D. Wilson presided.

place-to-keep counts,[2] and was acquitted of the other counts.

Padilla was sentenced to ten years of imprisonment with a mandatory minimum term of two years on Counts 3 and 4. The sentences on Counts 3 and 4 were to run concurrently with each other and with a five-year term of imprisonment imposed upon the revocation of Padilla's probation in another case. After receiving a thirty-day extension, Padilla timely filed his notice of appeal on May 16, 2005.

At trial, Padilla requested that as to each of Counts 1 through 4, the jury be instructed on the justification defenses of choice of evils, use of force in self-protection, and use of force for the protection of others. The circuit court only partially granted Padilla's request. As to Counts 3 and 4, the circuit court instructed the jury on the choice of evils defense, but, over Padilla's objection, the court did not instruct the jury on the defenses of use of force in self-protection and for the protection of others. As to Counts 1 and 2, the court instructed the jury on the defenses of use of force in self-protection and the protection of others, but not on the choice of evils defense.

On appeal, Padilla argues that: 1) the circuit court erred in denying his request that, in addition to the choice of evils defense, the jury be instructed on the justification defenses of use of force in self-protection and for the protection of others as to the felon-in-possession and place-to-keep charges; 2) the court erred in instructing the jury that the prosecution was not required to call all witnesses to the events at issue; and 3) the court plainly erred in failing to give a merger instruction, pursuant to HRS § 701–109(1)(e) (1993), regarding the felon-in-possession and place-to-keep charges.

With respect to Padilla's first point of error, we conclude that the circuit court's choice of evils instruction adequately covered Padilla's justification theory and that Padilla suffered no prejudice from the court's refusal to instruct on the defenses of use of force in self-protection and for the protection of others. As to Padilla's second point, we reject his contention that the circuit court erred in instructing that the prosecution was not required to call all witnesses. As to Padilla's third point, we conclude that the circuit court plainly erred in failing to give a merger instruction regarding the felon-in-possession and the place-to-keep counts. The absence of the merger instruction, however, did not affect the validity of the jury's finding that the prosecution proved each of these counts. Rather, the erroneous omission of the merger instruction only precludes the entry of judgment of conviction on both counts. Accordingly, on remand, Plaintiff–Appellee State of Hawai'i (the State) shall be given the option of: 1) accepting the entry of judgment on either Count 3 (felon-in-possession) or Count 4 (place-to-keep) and dismissing the

---

**2.** Defendant–Appellant Robert Anthony Padilla (Padilla) was charged in Count 3 with violating Hawaii Revised Statutes (HRS) § 134–7(b) and (h) (1993), which provide, in relevant part:

(b) No person who . . . has been convicted in this State or elsewhere of having committed a felony . . . shall own, possess, or control any firearm or ammunition therefor.

. . . .

(h) . . . [A]ny felon violating subsection (b) shall be guilty of a class B felony.

Padilla was charged in Count 4 with violating HRS § 134–6(c) and (e) (Supp.1999), which at the time of the charged offense provided, in relevant part:

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

. . . .

(e). . . . Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony.

Effective May 2, 2006, the Hawai'i Legislature repealed HRS § 134–6 and replaced it with HRS §§ 134–21 through 134–27 (Supp.2006).

other count; or 2) retrying Padilla on both Counts 3 and 4 with an appropriate merger instruction.

## BACKGROUND

In the evening on March 12, 2002, Padilla was driving his white Isuzu pickup truck with Annaliza Dubey (Dubey) seated in the front passenger seat. Mahelona, Baltazar, and their girlfriends were in a black Ford F–150 truck, with Baltazar's girlfriend driving. Mahelona spotted Padilla on Fort Weaver Road in Ewa Beach, and a high-speed chase ensued. Mahelona testified that Padilla owed him money for a car stereo, while Padilla testified that Mahelona was attempting to extort money from him. Padilla turned off Fort Weaver Road and drove on side streets in an effort to elude the black truck. The chase ended when the black truck forced Padilla's truck to swerve into a rock garden in the yard of Cathy Tripp (Tripp). A large boulder or cement planter in the garden prevented Padilla's truck from going forward, and the black truck parked behind Padilla's truck, blocking it in.

Tripp was in her garage next to the rock garden when Padilla's truck veered onto her property. Tripp testified that two males got out of the black truck and approached the white truck that was stuck in her rock garden. The two men, whom Tripp characterized as "the trouble makers[,]" tried to grab a large rock in the garden but were unable to lift it. Tripp saw the driver of the white truck stick his hand out the window and fire gunshots. Tripp believed the driver of the white truck shot to scare the two men away because they were close enough for the driver to shoot them if that was what he wanted.

Padilla testified that when his truck got stuck in the rock garden, Mahelona and Baltazar got out of the black truck. They began pounding on Padilla's truck. According to Padilla, Mahelona came to the driver's-side door, pointed a gun at Padilla, and ordered Padilla to roll down the window. Padilla complied and Mahelona stuck his hand inside Padilla's truck, holding the gun near Padilla's head. In response, Padilla began "slamming the gun" as hard as he could. As Mahelona

pulled his hand back, the gun dropped to the floor of Padilla's truck.

Padilla stated that Mahelona and Baltazar did not retreat but tried to pick up a rock, which proved to be too heavy, and then began gathering smaller rocks. Padilla testified that he picked the gun off the floor and took the safety off. As Baltazar approached the truck, Padilla fired into the ground, causing Baltazar to flee. Mahelona, however, continued to approach Padilla's truck carrying rocks and what looked like a piece of rebar. Padilla fired two more shots into the ground before Mahelona ran. Padilla maneuvered his truck back and forth until he was able to extricate himself from the rock garden and drive away.

Mahelona testified that during the incident at Tripp's residence, he did not have a gun and did not put his hand inside Padilla's truck. Tripp testified that she did not see either man from the black truck go to the driver's-side door of the white truck. She stated that other than trying to pick up a large rock, the two men did not have anything in their hands. When asked whether the two men from the black truck had a gun in their hands, Tripp responded, "I don't know. I never see nothing. All I saw them trying to do is pick up the rock."

Padilla testified that he did not remember what happened to the gun after he shot it. Shortly after leaving Tripp's yard, Padilla saw Honolulu Police Department (HPD) Officer Thomas Barboza (Officer Barboza), who was engaged in a traffic stop of another vehicle on Fort Weaver Road. Padilla parked his truck in front of Officer Barboza's car. Dubey ran to Officer Barboza and told him that people in a black truck "tried to ram [Padilla and Dubey] off the road" and "strong-arm her boyfriend." Padilla also approached Officer Barboza and verified the information Dubey had provided. Officer Barboza testified that Padilla appeared nervous and denied knowing the people who were trying to "strong-arm" him. Officer Barboza asked Padilla if he wanted to make a report regarding the incident, but Padilla declined. Padilla did not tell Officer Barboza that he had fired a gun or that there was a

gun in his truck. Padilla walked back to his truck with Dubey and drove away.

Meanwhile, Officer Barboza heard over the police radio that a black truck had attempted to run a white truck off the road and that the driver of the white truck had fired shots. Suspecting that Padilla was involved in this incident, Officer Barboza returned to his vehicle, activated his siren, and stopped Padilla's truck about a quarter mile down the road. Padilla was arrested and his truck was towed to the police station, where it was searched pursuant to a search warrant.

The police opened a floral bag containing women's clothing, which was in the bed of Padilla's truck. The police found a .25 caliber, semi-automatic pistol in the pant leg of women's jeans they removed from the floral bag as well as a methamphetamine pipe in the bag. From a coin purse found on the floor of the driver's seat, the police recovered approximately 24 grams of a substance containing methamphetamine. The police also performed tests which detected gunpowder residue on Padilla's left palm.

## DISCUSSION

### I.

### A.

The circuit court gave the following instruction on the choice of evils defense with respect to Counts 3 and 4:

It is a defense to the charges of Count 3, Possession or Control of a Firearm or Ammunition for a Firearm by a Person Convicted of Specified Crimes[,] and Count 4, Place to Keep a Firearm, that the defendant's conduct was legally justified. The law recognizes the "choice of evils" defense, also referred to as the "necessity" defense.

The "choice of evils" defense justifies the defendant's conduct if the defendant reasonably believes such conduct is necessary to avoid an imminent harm or evil to himself or another person. The conduct is justifiable if the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged.

If the prosecution has not proved beyond a reasonable doubt that the defendant's conduct was not legally justified by the "choice of evils" defense, then you must find the defendant not guilty of the charges of Count 3, Possession or Control of a Firearm or Ammunition for a Firearm by a Person Convicted of Specified Crimes, and Count 4, Place to Keep a Firearm. If the prosecution has done so, then you must find that the "choice of evils" defense does not apply.

If you find that the defendant was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this defense is unavailable as a defense to the charges of Count 3, Possession or Control of a Firearm or Ammunition for a Firearm by a Person Convicted of Specified Crimes, and Count 4, Place to Keep a Firearm.

As part of its instructions on the material elements for Counts 3 and 4, the court required the jury to find beyond a reasonable doubt that Padilla's conduct "was not justified by the defense of choice of evils."

 On appeal, Padilla argues that the circuit court erred in denying his request that, in addition to the choice of evils defense, the jury be instructed on the justification defenses of use of force in self-protection and use of force for the protection of others with respect to Counts 3 and 4.[3] We apply

---

3. The justification defenses of use of force in self-protection and use of force for the protection of other persons are set forth, respectively, in HRS § 703–304 (1993 & Supp.2006) and HRS § 703–305 (1993). HRS § 703–304 provides in relevant part:

§ **703–304 Use of force in self-protection.**
(1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

the following standard of review in evaluating claims that the trial court erred in its jury instructions.

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Gonsalves,* 108 Hawai'i 289, 292–93, 119 P.3d 597, 600–01 (2005) (internal quotation marks, citations, and brackets omitted; block quote format changed).

Padilla's theory of defense to Counts 3 and 4 was that his possession of the .25 caliber pistol was justified because it was necessary to protect himself and Dubey from being killed or seriously injured by Mahelona and Baltazar. We conclude that the choice of evils instruction given by the circuit court adequately permitted Padilla to present his theory of defense to the jury. Padilla suffered no prejudice from the circuit court's refusal to instruct on the defenses of use of

(3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

. . . .

(5) The use of deadly force is not justifiable under this section if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:

(i) The actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be; and

(ii) A public officer justified in using force in the performance of his duties, or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape, is not obliged to desist from efforts to perform his duty, effect the arrest, or prevent the escape because of resistance or threatened resistance by or on behalf of the person against whom the action is directed.

HRS § 703–305 provides:

§ 703–305 **Use of force for the protection of other persons.** (1) Subject to the provisions of this section and of section 703–310, the use of force upon or toward the person of another is justifiable to protect a third person when:

(a) Under the circumstances as the actor believes them to be, the person whom the actor seeks to protect would be justified in using such protective force; and

(b) The actor believes that the actor's intervention is necessary for the protection of the other person.

(2) Notwithstanding subsection (1):

(a) When the actor would be obliged under section 703–304 to retreat, to surrender the possession of a thing, or to comply with a demand before using force in self-protection, the actor is not obliged to do so before using force for the protection of another person, unless the actor knows that the actor can thereby secure the complete safety of such other person; and

(b) When the person whom the actor seeks to protect would be obliged under section 703–304 to retreat, to surrender the possession of a thing or to comply with a demand if the person knew that the person could obtain complete safety by so doing, the actor is obliged to try to cause the person to do so before using force in the person's protection if the actor knows that the actor can obtain the other's complete safety in that way; and

(c) Neither the actor nor the person whom the actor seeks to protect is obliged to retreat when in the other's dwelling or place of work to any greater extent than in the actor's or the person's own.

force in self-protection and for the protection of others with respect to Counts 3 and 4. Thus, the circuit court's instructions were not "prejudicially insufficient, erroneous, inconsistent, or misleading." *Id.* at 292, 119 P.3d at 600.

## B.

It appears that most jurisdictions recognize a justification defense where the defendant's otherwise unlawful possession of a firearm is immediately necessary for self-defense or the defense of others. *See* Sara L. Johnson, Annotation, *Fact that Weapon was Acquired for Self-Defense or to Prevent its Use Against Defendant as Defense in Prosecution for Violation of State Statute Prohibiting Persons Under Indictment for, or Convicted of, Crime from Acquiring, Having, Carrying, or Using Firearms or Weapons,* 39 A.L.R.4th 967 (1985). The approach generally adopted by the federal courts is instructive. One of the leading cases is *United States v. Panter,* 688 F.2d 268 (5th Cir.1982).

In *Panter,* the Fifth Circuit confronted a factual scenario similar to that recounted by Padilla. Panter, a convicted felon, was stabbed in the stomach with a knife while tending bar. *Id.* at 269. Panter claimed that during the struggle with the assailant, Panter reached underneath the bar for a club that he knew was kept there, but instead found a gun. *Id.* Panter shot and killed his assailant, then placed the gun on the bar where it was later recovered by the police. *Id.* Panter was charged with, and found guilty by a jury of, being a felon in possession of a firearm, in violation of 18 U.S.C.App. § 1202(a)(1).[4]

The trial court directed the jury to ignore Panter's self-defense claim by instructing the jury that it should not consider Panter's reason for possession of the firearm as a defense. *Id.* at 270. Panter challenged this instruction on appeal. The government responded by arguing that the proscription against a felon possessing a firearm in 18 U.S.C.App. § 1202(a)(1) was absolute and thus self-defense was not a cognizable defense to a prosecution under that statute. *Id.* at 271–72. The Fifth Circuit noted that the doctrine of self-defense was part of the common law and that "Congress in enacting criminal statutes legislates against a background of Anglo–Saxon common law." *Id.* at 271 (quoting, *United States v. Bailey,* 444 U.S. 394, 415 n. 11, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)) (ellipsis omitted). In rejecting the government's argument, the court stated:

> If the government were to carry the day here, ex-felons such as Panter, when confronted by assailants such as Lins, would find themselves between a rock and a hard place—death being the rock and a federal penitentiary the hard place. Consider this example: Lins draws a gun, rather than his knife, and begins shooting at Panter. If Panter merely disarms Lins and holds him at bay he violates § 1202. We do not believe that Congress intended to make ex-felons helpless targets for assassins. The right to defend oneself from a deadly attack is fundamental. Congress did not contemplate that § 1202 would divest convicted felons of that right.

*Id.* at 271 (footnote omitted).

The court held that "where a convicted felon, reacting out of a reasonable fear for the life or safety of himself, in the actual, physical course of a conflict that he did not provoke, takes temporary possession of a firearm for the purpose or in the course of defending himself, he is not guilty of violating § 1202(a)(1)." *Id.* at 272. The court emphasized that its holding only permits a felon to possess a firearm during the time the felon is endangered. *Id.* "Possession either before the danger or for any significant period after it remains a violation." *Id.*

■ We agree with the principles expressed in *Panter.* A defendant whose possession of a firearm would otherwise be unlawful is justified in temporarily possessing a firearm where such possession is immediately necessary to protect the defendant or another from serious physical harm. The defendant is entitled to maintain possession of the firearm so long as the imminent need for

---

**4.** 18 U.S.C.App. § 1202(a)(1) (repealed 1986) was the predecessor provision to the current federal felon-in-possession statute, 18 U.S.C. § 922(g)(1).

the protection persists. The defendant cannot obtain possession of the firearm before the imminent need for protection arises, *see United States v. Hudson*, 414 F.3d 931, 933–34 (8th Cir.2005); *United States v. Perez*, 86 F.3d 735, 736–37 (1996), and must terminate possession of the firearm at the earliest possible opportunity once the danger has passed. *See United States v. Butler*, 485 F.3d 569, 572–73 (10th Cir.2007); *United States v. Paolello*, 951 F.2d 537, 540–42 (3rd Cir.1991); *United States v. Beasley*, 346 F.3d 930, 935–36 (9th Cir.2003).

Since *Panter*, federal courts have generally agreed that a defendant is entitled to a justification defense in a felon-in-possession prosecution where the defendant's acquisition and possession of a gun is necessary to avoid imminent and serious harm to the defendant or others. The courts, however, have not agreed on the nomenclature for this justification defense and have used the terms duress, necessity, self-defense, and justification interchangeably. *Butler*, 485 F.3d at 572 n. 1; *United States v. Leahy*, 473 F.3d 401, 406 (1st Cir.2007). In felon-in-possession cases, the distinctions between the common law defenses of duress, necessity, and self-defense are regarded as immaterial, *see Beasley*, 346 F.3d at 934–35; *Perez*, 86 F.3d at 736, and the modern trend is to lump these defenses together under the generic rubric of "justification." *Butler*, 485 F.3d at 572 n. 1; *Leahy*, 473 F.3d at 406.

As formulated by the federal courts, this justification defense generally has the following four elements:

1) the defendant was under an unlawful and present threat of death or serious bodily injury;

2) the defendant did not recklessly or negligently place himself or herself in a situation where the defendant would be forced to engage in criminal conduct;

3) the defendant had no reasonable, legal alternative to violating the law, that is, a chance both to refuse to engage in the criminal act and also to avoid the threatened harm; and

4) there was a direct causal relationship between the defendant's criminal action and the avoidance of the threatened harm. *See, e.g., Beasley*, 346 F.3d at 933; *Butler*, 485 F.3d at 572.[5]

## C.

Unlike federal courts which are free to craft a justification defense to fit particular circumstances based on the common law, Hawai'i courts are constrained by the statutory defenses set forth in the Hawaii Penal Code. In *State v. Maumalanga*, 90 Hawai'i 58, 63, 976 P.2d 372, 377 (1999), the Hawai'i Supreme Court held that common law considerations cannot be grafted onto the choice of evils defense set forth in HRS § 703–302 (1993). In doing so, the supreme court rejected the portion of the Intermediate Court of Appeals's majority opinion which had incorporated common law elements into the choice of evils defense and instead adopted the analysis reflected in the dissenting portion of Judge Acoba's concurring and dissenting opinion. *Id.* at 59, 63, 976 P.2d at 373, 377.[6] The supreme court agreed with Judge Acoba's dissenting position and concluded that "all of the elements of the choice of evils defense are contained within the express language of HRS § 703–302" and that any common law formulations of the defense had been "superseded by the adoption of the Hawai'i Penal Code." *Id.* at 63, 976 P.2d at 372. We read the supreme court's decision in *Maumalanga* to mean that the courts are not free to modify the justification defenses set forth in the Hawaii Penal Code but must apply those defenses as written.

---

5. The federal courts make this justification defense an affirmative defense which the defendant has the burden of proving by a preponderance of the evidence. *Dixon v. United States*, —— U.S. ——, ——, 126 S.Ct. 2437, 2447, 165 L.Ed.2d 299 (2006); *United States v. Leahy*, 473 F.3d 401, 405–09 (1st Cir.2007); *United States v. Beasley*, 346 F.3d 930, 935–36 (9th Cir.2003).

6. The Intermediate Court of Appeals's opinion in *State v. Maumalanga* is reported at 90 Hawai'i 96, 976 P.2d 410 (App.1998). The analysis of Judge Acoba, now Justice Acoba, which was adopted by the Hawai'i Supreme Court is set forth at 90 Hawai'i at 109–13, 976 P.2d at 422–27.

In Padilla's case, the HRS § 703–302 choice of evils defense provides a more comprehensive defense and a better fit for Padilla's justification theory than the defenses of use of force in self-protection and for the protection of others set forth in HRS §§ 703–304 (1993 & Supp.2006) and 703–305 (1993).[7] The terms of the HRS §§ 703–304 and 703–305 justification defenses are not easily applied to Padilla's situation. First, the HRS §§ 703–304 and 703–305 defenses are directed at justifying acts involving the use of force, not the act of possession. Second, once the use of force has ended, those defenses cease to apply.

The HRS §§ 703–304 and 703–305 defenses would only justify Padilla's possession of the gun that was simultaneous with his use of force. For example, assume that Padilla's acquisition of the gun (by taking it from Mahelona) and Padilla's firing the shots were justified by the immediate need to protect himself and Dubey under the HRS §§ 703–304 and 703–305 defenses.[8] If the jury found that Padilla continued to actually or constructively possess the gun in his truck after he fired the shots and drove away from Tripp's yard, the HRS §§ 703–304 and 703–305 defenses could not be used to justify such continued possession.

Unlike the HRS §§ 703–304 and 703–305 defenses, the choice of evils defense set forth in HRS § 703–302 is not limited to justifying the use of force but applies to "conduct," a term that encompasses both the use of force and the act of possession. HRS § 703–302 provides in relevant part:

> (1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:
>
> (a) The harm or evil sought to be avoided by such conduct is greater than

that sought to be prevented by the law defining the offense charged[.][9] The circuit court's choice of evils instruction tracked the language of HRS § 703–302.

Under the evidence presented in Padilla's case, the choice of evils defense fully encompassed the HRS §§ 703–304 and 703–305 defenses of use of force in self-protection and for the protection of others. Any use of force by Padilla that would have been justified under the HRS § 703–304 and 703–305 defenses was covered by the choice of evils defense.

The choice of evils defense under HRS § 703–302 does not speak in terms of protecting "against the use of unlawful force by the other person. . . ." HRS § 703–304. The language of HRS § 703–302, however, permits conduct "necessary to avoid an imminent harm or evil to the actor or to another" and thus is broad enough to authorize actions to protect against the use of unlawful force. The HRS §§ 703–304 and 703–305 defenses authorize the defendant to act once he or she reasonably believes that the use of force is immediately necessary for self-protection or to protect others. The choice of evils defense under HRS § 703–302 authorizes the defendant to act if the defendant reasonably believes that his or her conduct is necessary to avoid an imminent harm or evil and if the harm or evil sought to be avoided is greater than that sought to be prevented by the law being broken by the defendant's conduct.

In the context of Padilla's justification defense, the differences between the choice of evils defense and the HRS §§ 703–304 and 703–305 defenses are immaterial. According to Padilla, he took the gun away from Mahelona and possessed the gun in order to prevent Mahelona and Baltazar from killing or seriously injuring Padilla and Dubey. Under Padilla's theory of defense, the harm sought to be avoided by his possession of the gun

---

**7.** See *Williams v. State*, 953 So.2d 260, 263–64 (Miss.Ct.App.2006) (concluding that necessity is a valid defense to a charge of being a felon in possession of a firearm, but that self-defense is not a viable defense to such charge); *United States v. Nolan*, 700 F.2d 479, 484 n. 1 (9th Cir.1983) (suggesting that "necessity" and not "self-defense" is the appropriate label for the type of defense raised by Padilla where the defen-

dant is charged with unlawful firearms possession).

**8.** For purposes of this analysis, we accept Padilla's version of what happened.

**9.** HRS § 703–300 (1993) defines the term "believes" as used in HRS § 703–302 (1993) to mean "reasonably believes."

was clearly greater than the harm sought to be prevented by the laws defining the felon-in-possession and place-to-keep offenses. Accordingly, Padilla suffered no prejudice from the circuit court's refusal to give instructions based on HRS §§ 703–304 and 703–305. Padilla's theory of defense was fully and adequately covered by the choice of evils instruction which the circuit court gave as to Counts 3 and 4. Under the circumstances of Padilla's case, there is no reasonable possibility that the jury, which rejected Padilla's choice of evils defense, might have embraced defenses based on HRS §§ 703–304 and 703–305.

## II.

■ The circuit court gave the following instructions to the jury regarding the parties' obligation to present evidence:

### 3.12 Prosecution Not Required to Call All Witnesses

The prosecution is not required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events, or to produce all objects or documents mentioned or suggested by the evidence.

### 3.13 Defendant Not Required to Call Any Witnesses

The defendant has no duty or obligation to call any witnesses or produce any evidence.[10]

Padilla objected to Instruction 3.12. On appeal, Padilla contends that the circuit court erred in giving Instruction 3.12 because it was inconsistent with the instructions on reasonable doubt, burden of proof, and presumption of innocence. We disagree.

Padilla cites no authority that supports his claim of error. The circuit court paired Instruction 3.12 with Instruction 3.13, which advised the jury that the defendant had no obligation to produce any evidence. The court's Instruction 3.12 correctly stated the law as it applied to Padilla's case. *See People v. Hunt,* 221 Cal.App.2d 224, 34 Cal.Rptr. 421, 423 (1963) ("The general rule is that the

prosecution is not required to call as witnesses all persons who have knowledge of an offense alleged to have been committed by the defendant on trial."); *State v. Watts,* 249 S.C. 80, 152 S.E.2d 684, 688 (1967). We see nothing in Instruction 3.12 that is inconsistent with the law pertaining to reasonable doubt, the prosecution's burden of proof, and the presumption of innocence.

## III.

■ Neither party submitted a proposed merger instruction to the circuit court. The court did not *sua sponte* fashion its own merger instruction. On appeal, Padilla argues that the circuit court committed plain error in failing to give the jury a merger instruction with respect to Counts 3 and 4. Padilla contends that, pursuant to HRS § 701–109(1)(e), the court was required to instruct the jury that in order to find him guilty of both Counts 3 and 4, the jury had to find that he acted with separate and distinct intents in committing the two offenses.

HRS § 701–109(1)(e) (1993) provides:

(1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

. . . .

(e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

In *State v. Matias,* 102 Hawai'i 300, 75 P.3d 1191 (2003), the Hawai'i Supreme Court held that HRS § 701–109(1)(e) applied where the defendant was prosecuted on felon-in-possession and place-to-keep charges, the same charges involved in Padilla's case. The court reasoned:

HRS § 701–109(1)(e) . . . interposes a constraint on multiple convictions arising

---

10. The two instructions given by the trial court were based on Hawaii Standard Jury Instruction–Criminal (HAWJIC) Instruction 3.12 and 3.13 (1991).

from the same criminal conduct. The statute "reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal[.]" *See* Commentary on HRS § 701–109.

Whether a course of conduct gives rise to more than one crime [within the meaning of HRS § 701–109(1)(e) ] depends in part on the intent and objective of the defendant. The test to determine whether the defendant intended to commit more than one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. Where there is one intention, one general impulse, and one plan, there is but one offense. *All factual issues involved in this determination must be decided by the trier of fact.*

*Id.* at 305, 75 P.3d at 1196 (block quote format changed).

The supreme court concluded that the evidence upon which the jury based its guilty verdicts on the felon-in-possession and place-to-keep counts arose out of the same factual circumstances—namely a police officer's recovery of a gun in the area of a car where the defendant had been sitting. *Id.* at 306, 75 P.3d at 1197. The court held that the trial court had committed plain error in failing to give a merger instruction requiring the jury to determine whether the defendant's conduct constituted separate and distinct culpable acts or an uninterrupted continuous course of conduct. *Id.* In a footnote, the court observed:

[I]t is common-sensical that a defendant charged in connection with the same incident with the offenses of place to keep pistol or revolver (Count I) and ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes (Count II) would, *in virtually every instance,* be entitled to a merger instruction, pursuant to HRS 701–109(1)(e), because both offenses would intrinsically arise out of the same conduct and attendant circumstances.

*Id.* at 306 n. 10, 75 P.3d at 1197 n. 10 (emphasis added).

In light of *Matias,* we conclude that the circuit court committed plain error in failing to give an instruction regarding the possible merger of Counts 3 and 4, pursuant to HRS § 701–109(1)(e). The State anticipates our ruling and argues that even if the circuit court committed plain error by not giving an HRS § 701–109(1)(e) merger instruction, "a new trial is not necessary because the State could obviate the error by dismissing either Count III or IV." We agree.

HRS § 701–109(1)(e) only prohibits *conviction* for two offenses if the offenses merge; it specifically permits *prosecution* on both offenses. Therefore, even if the felon-in-possession and the place-to-keep charges merged pursuant to HRS § 701–109(1)(e), conviction on one of the two charges was permissible. Here, the jury found Padilla guilty beyond a reasonable doubt of both charges. We fail to see any reason why the State should not be permitted to dismiss one of the two charges and maintain the judgment of conviction and sentence on the other. Accordingly, on remand, we afford the State the option of: 1) dismissing either Count 3 or Count 4 and retaining the judgment of conviction and sentence on the non-dismissed count; or 2) retrying Padilla on both Counts 3 and 4 with an appropriate merger instruction.

The Hawai'i Supreme Court has followed a similar approach in analogous situations. In *Garringer v. State,* 80 Hawai'i 327, 334–35, 909 P.2d 1142, 1149–50 (1996), the jury's verdict did not include findings necessary to support the imposition of a mandatory minimum sentence under HRS § 706–660.1(1) (1993). The Hawai'i Supreme Court gave the prosecution the option of retrying the case to permit the jury to make the findings required by HRS § 706–660.1(1) or consenting to resentencing without the mandatory minimum. *Id.* In *State v. Vanstory,* 91 Hawai'i 33, 48–49, 979 P.2d 1059, 1074–75 (1999), the Hawai'i Supreme Court held that the defendant had been improperly convicted of both an offense (carrying or use of a firearm in the commission of first degree robbery) and an included offense (first degree robbery) because the offenses merged pursuant

518

to HRS § 709–109(1)(a) (1993). The court remedied the merger violation by reversing the conviction for first degree robbery and affirming the conviction for carrying or use of a firearm in the commission of first degree robbery. *Id.*[11]

We note that in *Matias,* the Hawai'i Supreme Court vacated both of the defendant's convictions and remanded for a new trial without discussion of whether the State would be allowed to remedy the trial court's failure to give a merger instruction under HRS § 701–109(1)(e) by dismissing one of the two counts. *Matias,* 102 Hawai'i at 306, 75 P.3d at 1197. The same is true of the court's recent decision in *State v. Frisbee,* 114 Hawai'i 76, 84, 156 P.3d 1182, 1190 (2007). However, there is no indication in those decisions that the State requested that it be allowed to remedy the merger-instruction error by dismissing one of the two counts that could potentially merge, a remedy the State appears to be requesting in this case. We do not read *Matias* or *Frisbee* as precluding the approach we take here.

### CONCLUSION

We vacate the March 16, 2005, Judgment of the circuit court and remand the case for further proceedings consistent with this opinion. Within 30 days after the effective date of this court's entry of judgment in this appeal, the State shall notify the circuit court whether the State will 1) dismiss Count 3 or Count 4 or 2) retry Padilla on both counts. If the State chooses to dismiss Count 3 or Count 4, the circuit court shall enter an Amended Judgment that reinstates the conviction and sentence on the non-dismissed count and reflects the dismissal of the other count with prejudice. If the State chooses to retry Padilla on both Counts 3 and 4, the circuit court shall give an appropriate merger instruction on retrial.

---

**11.** We note that in *State v. Brantley,* 99 Hawai'i 463, 465–70, 56 P.3d 1252, 1254–59 (2002), the Hawai'i Supreme Court overruled the authority it had relied upon in *State v. Vanstory,* 91 Hawai'i 33, 48–49, 979 P.2d 1059, 1074–75 (1999), to conclude that the offense of carrying or use of a firearm in the commission of a separate felony, HRS § 134–6(a) (Supp.1994), merged with the underlying separate felony. *Brantley,* however, did not affect the validity of the supreme court's analysis in *Vanstory* regarding the appropriate remedy for a merger violation.