*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-14-0001090
22-APR-2020
10:39 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---oOo---

_____

STATE OF HAWAIʻI, Respondent/Plaintiff-Appellee,

vs.

KEAKA MARTIN, Petitioner/Defendant-Appellant.

_____

SCWC-14-0001090

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0001090; 3PC131000062)

APRIL 22, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This appeal arises out of the shooting of two Hawaiʻi Police Department ("HPD") officers on the evening of January 2, 2013. Keaka Martin ("Martin") was convicted after a jury trial in the Circuit Court of the Third Circuit ("circuit court") of various counts, including attempted murder of one of the officers.  On

August 5, 2014, the circuit court[1] entered its judgment of conviction and sentence, sentencing Martin to life imprisonment without the possibility of parole plus ten years.

Martin appealed the judgment of conviction and sentence to the Intermediate Court of Appeals ("ICA"). The ICA affirmed. Martin's application for writ of certiorari to this court ("Application") raises five questions:

> 1. Did the ICA commit grave errors of law and fact when it held that the trial court did not engage in a deficient <u>Tachibana</u> colloquy?
>
> 2. Did the ICA commit grave errors of law and fact when it held that the trial court properly admitted evidence of defendant's suicide attempt?
>
> 3. Did the ICA commit grave errors of law and fact when it held that the trial court properly admitted evidence of defendant's statement that he shot himself?
>
> 4. Did the ICA commit grave errors of law and fact by holding that the trial court did not err in admitting prior bad acts of defendant?
>
> 5. Did the ICA commit grave errors of law and fact by holding that defendant's convictions for attempted murder and assault in the first degree should [not] be vacated because the trial court failed to properly instruct the jury on lesser-included offenses?

For the reasons explained below, the issues Martin raises on certiorari lack merit. We do, however, address Martin's second question on certiorari regarding his suicide attempt the day after the shooting. The circuit court properly ruled the evidence admissible as probative of Martin's identity as the person who had committed the offenses. The circuit court,

---

[1] The Honorable Greg K. Nakamura presided.

2

however, also <u>sua</u> <u>sponte</u> applied the majority rule across the country to rule that the evidence of Martin's suicide attempt was also admissible as relevant to his "consciousness of guilt."

We hold that evidence of a suicide or attempted suicide is not automatically admissible as relevant to a defendant's consciousness of guilt. As recognized by the Vermont Supreme Court, "[t]he underlying reasons motivating an attempt to take one's life can be both numerous and highly complex . . . ." <u>State v. Onorato</u>, 762 A.2d 858, 859-60 (Vt. 2000). The New Jersey Supreme Court has also appropriately noted that, aside from guilt, other factors such as "a defendant's psychological, social or financial situation may underlie a suicide attempt." <u>State v. Mann</u>, 625 A.2d 1102, 1108 (N.J. 1993). Pursuant to HRS § 602-4 (2016),[2] we therefore provide guidance to the trial courts for any future cases in which evidence of a suicide or suicide attempt is proffered as evidence of consciousness of guilt. But because the circuit court correctly ruled the evidence admissible as probative of Martin's identity as the person who had committed the offenses charged, there was no error in the circuit court's admission into evidence of the suicide attempt.

---

[2]    HRS § 602-4 provides, "The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

Although the issues raised by Martin on certiorari lack merit, we notice plain error affecting Martin's substantial rights with respect to the lack of a merger instruction on Martin's firearms convictions on Counts 7, 8, and 9. We therefore vacate the ICA's July 9, 2019 judgment on appeal affirming the circuit court's August 5, 2014 judgment of conviction and sentence as to Counts 7, 8, and 9, and remand these counts to the circuit court for further proceedings consistent with this opinion.[3] We otherwise affirm the ICA's July 9, 2019 judgment on appeal affirming the circuit court's August 5, 2014 judgment of conviction and sentence.

## II. Background

### A. Factual summary

On January 2, 2013 at around 8:00 p.m., HPD officers Joshua Gouveia ("Officer Gouveia") and Garrett Hatada ("Officer Hatada") were assigned to a report of multiple gunshots fired in the Wailoa State Park area. During their investigation, the officers received information about a man hiding beneath a vehicle at Pono Place. Officers Gouveia and Hatada arrived at Pono Place and shined their flashlights under the vehicles in

---

[3]    As discussed in note 36, infra, because the circuit court sentenced Martin to five years on Count 7, ten years on Count 8, and ten years on Count 9, with the sentences for Counts 7, 8, and 9 to be served concurrently, the lack of a merger instruction does not affect the maximum sentence for Martin's convictions on these three charges.

the parking lot. Officer Gouveia saw a man lying on his back beneath a black truck. After calling for backup, Officer Gouveia approached the truck from the passenger's side while Officer Hatada approached from the driver's side. When Officer Gouveia crouched down, he saw the man under the truck reach into his waistband and remove a black and silver gun. Officers Gouveia and Hatada were both then shot in their legs.

That night, after the shooting, Kawika Paulino ("Paulino") gave a statement to the police regarding an encounter with Martin at the Pono Place parking lot earlier that evening. Paulino told the police that Martin had shown him a gun, had said he had been firing the gun "in the middle of Wailoa," and had also said that he would not go to jail without a fight. Darrel Constantino ("Constantino") also told the police that Martin had had a weapon with him at Pono Place.

The next day, an HPD special response team was assigned to make contact with Martin at an East Palai Street residence. After arriving at the residence and announcing themselves as police, a single shot was heard from inside the house. The response team deployed a remote control surveillance robot equipped with a live feed video camera into the house. Through the live feed, the team observed a man lying on his back with a pistol on the ground near his hand.

Officers entered the house and ordered the man not to move and to show his hands.  The man was bleeding from the abdominal area.  The man raised his hands slightly and said, "I shot myself."  Officers told the man to turn over and put his hands behind his back, and the man again said, "I shot myself."  The man was later identified as Martin.  The gun found near Martin matched bullet casings recovered from the Pono Place parking lot.

**B. Circuit court proceedings**

**1. Pretrial motions**

On February 28, 2013, Martin was charged via an indictment with attempted murder in the first degree as to Officer Hatada in violation of HRS §§ 705-500(1)(b) (1985) and 707-701 (Supp. 2011) (Count 1), assault in the first degree as to Officer Hatada in violation of HRS § 707-710 (Supp. 1986) (Count 2), carrying or use of a firearm in the commission of a separate felony in violation of HRS § 134-21(a) (Supp. 2006) (Count 3), attempted murder in the first degree as to Officer Gouveia in violation of HRS § 705-500(1)(b) and HRS § 707-710 (Count 4), assault in the first degree as to Officer Gouveia in violation of HRS § 707-710 (Count 5), carrying or use of a firearm in the commission of a separate felony in violation of HRS § 134-21(a) (Count 6), ownership or possession prohibited of any firearm or ammunition by a person charged with or convicted of certain

crimes in violation of HRS § 134-7(b) and (h) (Supp. 2006) (Count 7), carrying or possessing a loaded firearm on a public highway in violation of HRS § 134-26(a) (Supp. 2006) (Count 8), place to keep pistol or revolver in violation of HRS § 134-25(a) (Supp. 2006) (Count 9), alteration of identification marks prohibited in violation of HRS §§ 134-10 (Supp. 1988) and 134-17 (Supp. 1994) (Count 10), and reckless endangering in the second degree in violation of HRS § 707-714(a) (Supp. 2006) (Count 11).

On December 27, 2013, seeking to introduce into evidence Martin's "I shot myself" statements to the police, the State filed a motion for a determination that these statements had been voluntarily made.[4]  The State asserted that it did not have the burden of establishing that Miranda warnings were given unless the totality of the circumstances reflected that the statement was a result of custodial interrogation.  The State also contended that these unsolicited, spontaneous statements made by a defendant before any police questioning and in the absence of any coercion were admissible, citing State v. Amorin, 61 Haw. 356, 360, 604 P.2d 45, 48 (1979).  At the voluntariness hearing, Martin testified that he did not recall making any

---

[4]    HRS § 621-26 (1993) provides:

> No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made.

7

statements after he shot himself, that any statement he made was the product of a custodial interrogation, and that his physical condition impaired his ability to make a voluntary statement. The circuit court granted the State's motion.

Also on December 27, 2013, Martin filed his motion in limine #2 to preclude evidence of his self-inflicted gunshot wound. Martin argued that the evidence of his self-inflicted gunshot wound was a specific instance of conduct inadmissible under Hawaiʻi Rules of Evidence ("HRE") Rule 404(b) (1994) and that the evidence would result in excessive prejudice against him. In its memorandum in opposition, the State argued that evidence of Martin's self-inflicted gunshot wound was admissible under HRE Rule 404(b) as relevant and probative of identity, opportunity, intent, knowledge, and absence of mistake or accident.

At the hearing on the motion in limine #2, the circuit court sua sponte proposed that the evidence of Martin's suicide attempt was relevant to Martin's consciousness of guilt, citing an American Law Reports ("ALR") annotation.[5] In its written order denying Martin's motion, the circuit court concluded that evidence of Martin's suicide attempt was relevant and probative

---

[5] Dale Joseph Gilsinger, Annotation, Admissibility of Evidence Relating to Accused's Attempt to Commit Suicide, 73 A.L.R. 5th 615 (1999).

of Martin's consciousness of guilt, and that Martin's self-inflicted gunshot wound was also relevant to identity.

Martin's jury trial commenced on February 27, 2014.

### 2. Witness Testimony

#### a. HPD Officer Joshua Gouveia

State witness HPD Officer Gouveia testified as follows.

On January 2, 2013, at about 7:50 or 8:00 p.m., Officer Gouveia was assigned to multiple calls of possible gunshots fired in the Wailoa State Park area. Officer Gouveia, Officer Keith Nacis ("Officer Nacis"), Officer Hatada, and other officers checked the Wailoa State Park area, Pono Place, and Maile Apartments. During their searches, Officers Gouveia and Hatada received information about a man under a vehicle at Pono Place. Officer Gouveia arrived at the Pono Place parking lot at approximately 8:30 p.m., and Officer Hatada arrived separately. There was little to no lighting in the parking lot. A blue SUV, a black pickup truck, and a white vehicle were parked next to each other.

Officer Gouveia walked to the front of the blue SUV, shined his flashlight under the vehicles, and saw a man lying on his back beneath the black pickup truck. He discussed the situation with Officer Hatada and called for an additional unit. Officer Nacis arrived within a minute or two. Officer Gouveia approached the black pickup truck along the passenger's side,

Officer Nacis approached from the back, and Officer Hatada approached the driver's side.

When Officer Gouveia reached the front passenger door, he announced himself as a police officer and instructed the man to come out from under the truck.  Receiving no response, he repeated his instruction, crouched, and shined his flashlight under the vehicle.  Officer Gouveia saw the man reach into his waistband and remove a black and silver handgun.  Upon seeing the gun, Officer Gouveia said, loudly enough for everyone in the area to hear, "Let me see your hands.  Let me see your hands.  Don't do it.  Gun."

The man pointed the pistol toward Officer Gouveia from approximately one foot away.  Officer Gouveia saw a bright flash and felt a "hard pressure" in his left upper thigh area.  Realizing he had been shot, Officer Gouveia crawled away and heard approximately two to three more shots.  Officer Gouveia did not fire any shots.  He was later unable to identify a suspect from a photographic lineup.

### b.   Kawika Paulino

State witness Paulino testified as follows.  Paulino arrived at Pono Place to fish on January 2, 2013 at around 3:30 p.m. with his wife Hotina Paulino, Maria Sabater-Hart, Darrel Constantino, and his son.  Paulino parked his blue SUV next to a black vehicle in the Pono Place parking lot.  That evening,

Paulino called 911 to report hearing over twenty gunshots from the Wailoa area. The police arrived, and Paulino told them he had heard gunshots. After the police left, Martin and David Carroll ("Carroll") approached Paulino at his car. Paulino had known Martin for about three years, but he had only met Carroll a few times. Martin had a fanny pack that contained bullets and a silver and black gun, and Martin took out the gun and tried to hand it to Paulino. Martin told Paulino that "they were in the middle of Wailoa shooting the gun." Martin told Paulino that he had an outstanding warrant, was facing some jail time, and that he would not go to jail without a fight. After Martin told Paulino about the warrant, the "police approached a second time and [Martin] just ran." When the officers returned, they approached the black truck. Paulino was sitting in the driver's seat of his car when he heard multiple gunshots that he believed came from below the black truck. Paulino saw two officers "go down." The passenger door to his car had been left open, and Martin jumped into the back of his car and told Paulino to drive. Paulino drove to Hilo Lagoon, where he stopped because his wife was "freaking out" and because his son was in the back of the car. Paulino asked Martin to leave and "not do this to me and my family," after which Martin left. Paulino then called 911 and met with an officer near the scene to tell him what happened.

### c.  Doctor Dale Wren

State's witness Doctor Dale Wren ("Doctor Wren") testified as follows.  On January 2, 2013 at about 9:31 p.m., Doctor Wren treated Officer Gouveia at the Hilo Medical Center.  Officer Gouveia had suffered a gunshot wound to his left thigh hip area, but Doctor Wren did not observe an exit wound.  Using an X-ray scan taken of Officer Gouveia's pelvis on January 2, 2013, Doctor Wren identified the bullet fragments to the jury.  Doctor Wren explained that, while it was possible to perform surgery to remove the bullet fragments, such procedures frequently caused more damage than just leaving the fragments in.

On cross-examination, Doctor Wren testified that, to his knowledge, Officer Gouveia did not require any surgeries at the hospital.

### d.  Darrel Constantino

Defense witness Constantino testified as follows.  On January 2, 2013, Constatino was fishing with Paulino and his family.  Constantino was interviewed by the police after the Pono Place incident and was granted immunity in this case. Before his police interview, Constatino, Paulino, Hotina Paulino, and Maria Hart had discussed how they would present their statements to the police because they were afraid the police would think they were accomplices.

Constantino had told the police he had spoken to Martin at Pono Place and that Martin had a gun. He had also told the police that Martin told him that if the police came, he would duck under one of the cars and shoot at their legs. Constantino could not, however, remember Martin's or his own exact words. Constantino did not know who Martin was when he spoke to Martin, but Paulino had verbally identified Martin to Constantino after their conversation. After speaking with Martin, Constantino heard gunfire at Pono Place while he was standing in front of Paulino's car, and he jumped onto the car and left with Paulino's family. Constantino did not tell the police that a man had jumped into Paulino's car as they were leaving Pono Place.

On cross-examination, Constantino testified that Martin had told him that if the police came, "he'd be, like, 'fuck the cops,' and he'd disappear." When Paulino stopped the car, Martin jumped out of the back passenger seat.

**e.  HPD Officer Garrett Hatada**

State witness HPD Officer Hatada testified as follows. On January 2, 2013 at around 7:44 p.m., Officer Hatada was assigned to reports of gunshots fired in the Wailoa State Park area. Officer Hatada and Officer Gouveia went to Pono Place, where several people who were fishing told him they had heard gunshots forty minutes earlier from the Maile Street area. After

investigating Maile Street, Officer Hatada learned from dispatch that someone had reported a man hiding under a vehicle at Pono Place. Officer Hatada and Officer Gouveia returned to Pono Place, and Officer Gouveia indicated that he saw someone hiding beneath one of the vehicles. They called for an additional unit, and Officer Nacis arrived. Officer Hatada approached the driver's side of the dark-colored vehicle while Officer Gouveia approached from the passenger's side. Officer Hatada knelt down behind the vehicle's front tire and shined his flashlight on the person beneath the vehicle. Officer Hatada saw that the person had "short black hair" and tattoos on his arm. Officer Hatada then heard Officer Gouveia shout, "Don't do it, don't do it," as he saw the man fumbling with his waistband. Officer Hatada then stood up, drew his weapon, heard three gunshots, and felt pain in his leg. Officer Hatada fired two rounds toward the area he had seen the shooter. Officer Hatada then took cover under a banyan tree.

### f. Jair Trail

State witness Jair Trail ("Trail") testified as follows. Trail was staying at his Aunt Maile Labrador's house on Palai Street between December 2012 and January 2013, and Martin, Trail's uncle, would sometimes come over. On the night of January 2, 2013, Labrador told Trail that Martin could not come into the house. Later that night, Martin knocked on the door,

14

but Trail did not let him in.  Trail awoke at around 4:00 a.m. and heard Martin say, "But why?  It wasn't me.  I didn't do it." The next morning, Trail saw Martin sleeping on the couch. Martin spent the day reading the Bible and said "some crazy stuff" about living forever.  Martin also told Trail that he was not going back to jail.  At some point, Martin crawled out of his room and said that the police were there.  Trail saw S.W.A.T trucks outside and heard the police identify themselves.  He then saw Martin pull out a black and silver gun, put the gun against his chest, and pull the trigger.  Trail then exited the house and identified himself to the police.  On cross-examination, Trail testified that he heard Martin say, "I would rather die than go back to jail."  Trail did not know if Martin had any outstanding warrants or had actually served jail time before.

### g.    HPD Sergeant Aaron Carvalho

State witness Sergeant Aaron Carvalho ("Sergeant Carvalho") testified as follows.  On January 3, 2013, Sergeant Carvalho's special response team was assigned to make contact with a suspect in an attempted murder investigation on East Palai Street.  Sergeant Carvalho arrived at the residence in an armored vehicle at approximately 3:17 p.m.  Sergeant Kahalewai identified the group as police and gave verbal instructions over the PA system.  They then received a radio transmission that a

single shot was heard from inside the house.  A man, who later identified himself as Trail, came out of the house.  Trail told Sergeant Carvalho that Martin was in the house and that he had seen Martin shoot himself in the stomach.  Sergeant Carvalho then deployed a remote control surveillance robot with a live feed video camera into the house.  Through the live feed, he saw a man lying on his back with a pistol on the ground next to his left hand.  Sergeant Carvalho entered the house and saw the same man and pistol that he had seen through the live feed.  Sergeant Carvalho told the man not to move and to show his hands.  The man raised his hands slightly and said, "I shot myself." Sergeant Carvalho told the man to turn over and put his hands behind his back, and the man again said, "I shot myself."  The man appeared to be bleeding from the abdomen area, but he seemed to understand Sergeant Carvalho's commands.  In the courtroom, Sergeant Carvalho identified Martin as the man he had seen on the floor.

> h.    **HPD Detective Grant Todd**

State witness HPD Detective Grant Todd ("Detective Todd") testified as follows.  At 8:55 p.m. on January 2, 2013, Detective Todd learned that two officers had been shot at Pono Place.  Detective Todd arrived at Pono Place at around 9:00 p.m. Detective Todd saw two ambulances taking Officers Gouveia and Hatada away.  After learning what had happened from another

officer at the scene, Detective Todd began to secure the scene to preserve evidence.  Detective Todd observed three bullet casings underneath a black van and two casings at the front of the van.  Detective Todd noticed a hole in the door of the white truck consistent with "a projectile from a gun."  Detective Todd later received information that Martin was at a residence on East Palai Street on January 3, 2013.  As part of the investigation, Detective Todd sent to the HPD crime lab Officer Hatada's firearm, the firearm recovered from the East Palai Street house, the projectile located in the white truck, eight bullet casings recovered from a field at the end of Maile Street, the projectile found at the East Palai Street residence, the three casings located underneath the black van, and the two casings located at the front of the black van.

### i.  Cindee Lorenzo

State witness Cindee Lorenzo ("Lorenzo") testified as follows.  Lorenzo was a criminalist at the Honolulu Police Department Scientific Investigation Section ("SIS") assigned to the Firearm and Tool Mark Unit.  The State and defense stipulated to the chain of custody of items sent to SIS by Detective Todd.  Lorenzo determined that the eight casings recovered from Maile Street and the three casings found beneath the black vehicle matched the firearm recovered from the East Palai Street house.  Lorenzo also determined that the casing

recovered from the East Palai Street residence matched the firearm from the East Palai Street house.

### j. Sonya Chong

State witness Sonya Chong ("Chong") testified as follows. Chong had been Martin's girlfriend from December 2011 to June 2012 and she and Martin had lived together at the beginning of 2012. Chong had seen Martin with a silver and gray hand-held firearm toward the end of their relationship. Martin would practice aiming the firearm and say, "[F]uck the cops." On cross-examination, Chong testified that Martin did not indicate to her that he was fearful of others, but that Martin slept with his gun under his pillow. Chong also acknowledged that testifying against Martin was "an opportunity for [her] to get back at [him]."

### k. David Carroll

Defense witness David Carroll ("Carroll") testified as follows. On January 2, 2013, Carroll was beaten and arrested by police for disorderly conduct. On that day, the police told Carroll they were "looking for a murderer," and identified Martin by name. Carroll spent three days in jail and the police tried "to get [him] to state that [he had] personally seen [Martin] shoot the officers." Carroll had not, however, seen Martin shoot officers. On cross-examination, Carroll testified that Martin was "like a brother" to him, and that on January 2,

2013, he had been distraught because he thought the police had shot Martin. He had left Martin at Pono Place on January 2, 2013, and he knew Martin had a gun. Carroll also later testified as a witness called by the State as follows.

On January 2, 2013, Carroll had been living at the Maile Apartments. At around 7:00 p.m. on that day, Carroll had left home with Martin to buy milk for Carroll's son. Carroll and Martin stopped in front of the apartments and Martin asked Carroll if it was "okay to pop off some rounds." Martin showed Carroll a black gun, said "Fuck the police," and raised his gun and started shooting it into the air. After Martin fired the gun, Carroll saw police lights, and he and Martin "started crawling like military soldiers" to avoid being seen for approximately half an hour. Carroll and Martin then went to Pono Place, where Martin started a conversation with people fishing. Carroll left Martin at Pono Place and bought milk at a gas station. Carroll then returned to the Maile Apartments. At the Maile Apartments, Carroll ran into Misty Quiocho ("Quiocho"), who asked him where Martin was. Carroll told Quiocho that he was going to check on Martin at Pono Place. Carroll then heard a series of gunshots that "weren't all from the same weapon," and he "ran hysterically toward that direction" thinking Martin had been shot. While he was crossing a bridge, a police officer approached him from Pono Place and

yelled at him to "get back." Carroll walked back toward Maile Street to talk with his neighbors, but was then "ordered to approach the police officers," who wanted to question him about "why [he] came towards them in that way." Carroll testified the police slammed him into the ground and beat him up. He was then taken to the police station, where he stayed for three days.

### l.   Misty Quiocho

Defense witness Quiocho testified as follows. Quiocho had previously been convicted of crimes of dishonesty.[6] Martin had been Quiocho's boyfriend off and on for four years. During Quiocho's relationship with Martin, he had been afraid to sleep and would barricade the door "so nobody could come in to hurt us or him or his family." Quiocho had never seen Martin with a gun and had not heard him make threats against the police. Martin was fearful of and tried to avoid the police. Also, Martin had attempted suicide eight months to a year before January 2013. On cross-examination, Quiocho testified that she still loved Martin and that Martin had been avoiding the police because the police had a warrant for him.

---

[6]   Quiocho testified that she had been convicted for forgery in the second degree, theft in the second degree, theft in the fourth degree, and unauthorized entry into a motor vehicle. The admission of Quiocho's previous convictions are not raised as an issue on appeal.

### 3. <u>Tachibana</u> colloquy

On April 14, 2014, prior to the close of Martin's case, the circuit court conducted a Tachibana colloquy, which is quoted in Section IV.A below.

### 4. Martin's closing argument

In closing argument, Martin repeatedly argued identity as a defense. His arguments included assertions of reasonable doubt as to whether he was the person hiding under the black vehicle on January 2, 2013 who had shot the officers, that Officer Hatada had identified the suspect as having a full-sleeved tattoo, and that although he had a tattoo running down a portion of his left arm, it was not a full-sleeved tattoo, that Officer Gouveia had not been able to identify him as the suspect, and that the witnesses that had identified him as the suspect had credibility issues.

### 5. Verdict and sentencing

On April 10, 2014, the court dismissed Counts 2 and 5 (the lesser-included assault in the first degree charges) without prejudice. On April 24, 2014, the jury returned verdicts finding Martin guilty of the included offense of assault in the first degree against Officer Hatada (Count 1), two counts of use of a firearm in the commission of a separate felony (Counts 3 and 6), attempted murder in the first degree as to Officer Gouveia (Count 4), ownership or possession prohibited of any

21

firearm or ammunition by a person charged with or convicted of certain crimes (Count 7), carrying or possessing a loaded firearm on a public highway (Count 8), place to keep pistol or revolver (Count 9), and reckless endangering in the second degree (Count 11). The jury found Martin not guilty of alteration of identification marks prohibited (Count 10).

The sentencing hearing occurred on July 25, 2014. The State argued that consecutive sentencing was appropriate under the facts of the case. The circuit court stated that "the shooting of Officer Hatada involved serious criminal offenses which deserve separate punishment and there is a need for [a consecutive sentence] to . . . . stop[] others from committing similar crimes." The circuit court therefore sentenced Martin to ten years imprisonment on Count 1, twenty years on Count 3, life imprisonment without the possibility of parole on Count 4, twenty years on Count 6, five years on Count 7, ten years on Count 8, ten years on Count 9, and one year on Count 11. The court ordered that the sentences for Counts 3, 4, 6, 7, 8, 9, and 11 be served concurrently, but consecutively to the sentence in Count 1.

On August 5, 2014, the court entered its judgment of conviction and sentence, which Martin timely appealed to the ICA.

## C.    ICA proceedings

On appeal, Martin raised the following points of error

relevant to the issues on certiorari:[7]

> 1.    The trial court erred when it gave improper warnings
> in violation of State v. Tachibana, 79 Hawai'i 226, 900 P.2d
> 1293 (1995).
> 2.    The trial court erred by (i) admitting that Defendant
> attempted suicide on the date after the officers were shot,
> (ii) by determining the Defendant's statement "I shot
> myself" was voluntary, and (iii) allowing the introduction
> of such evidence without a limiting instruction.
> 3.    The trial court erred in allowing in evidence of
> other prior "bad acts" and in not providing a limiting
> instruction concerning these "bad acts."
> 4.    Defendant's convictions for attempted murder and for
> assault in the first degree should be vacated because the
> trial court failed to properly instruct the jury on lesser-
> included offenses.

The ICA rejected all of Martin's points of error on appeal

in its March 29, 2019 summary disposition order.  State v.

Martin, No. CAAP-14-0001090, at 1, 3 (App. Mar. 29, 2019) (SDO).

## D.    Application for Writ of Certiorari

Martin's Application raises presents five questions:

> 1.    Did the ICA commit grave errors of law and fact
> when it held that the trial court did not engage in a
> deficient Tachibana colloquy?
> 2.    Did the ICA commit grave errors of law and fact
> when it held that the trial court properly admitted
> evidence of defendant's suicide attempt?
> 3.    Did the ICA commit grave errors of law and fact
> when it held that the trial court properly admitted

---

[7]    Martin also raised the following issues to the ICA, which he does not raise on certiorari:  (1) The circuit court judge erred by failing to disqualify/recuse himself for donating money to the wife of one of the victims in this case; (2) Because the jury rendered an impermissibly inconsistent verdict when it found Martin guilty of assault in the first degree for the shooting of one officer and attempted murder for the shooting of the second officer, the circuit court wrongfully denied Martin's motion for new trial; (3) There was insufficient evidence to support the jury's conviction for attempted murder in Count 4; (4) The trial court erred in imposing consecutive sentences; and (9) Ineffective assistance of counsel. As there is no plain error in the ICA's decisions on these points of error, we do not further discuss any of these issues raised to the ICA.

23

> evidence of defendant's statement that he shot himself?
> 4.   Did the ICA commit grave errors of law and fact by holding that the trial court did not err in admitting prior bad acts of defendant?
> 5.   Did the ICA commit grave errors of law and fact by holding that defendant's convictions for attempted murder and assault in the first degree should [not] be vacated because the trial court failed to properly instruct the jury on lesser-included offenses?

## III.   Standards of review

### A.   Validity of waiver of the right to testify

The validity of a defendant's waiver of constitutional rights in a criminal case is a question of law under the state and federal constitutions, which we review under the right/wrong standard.  State v. Torres, 144 Hawai'i 282, 288, 439 P.3d 234, 240 (2019) (citations omitted).

### B.   Admissibility of evidence

> Different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue.  When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.  However, the traditional abuse of discretion standard is applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

State v. Williams, 146 Hawai'i 62, 72, 456 P.3d 135, 145 (2020) (brackets and citations omitted).

### C.   Jury instructions on lesser-included offenses

> When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.  Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

24

State v. Nichols, 111 Hawaiʻi 327, 334, 141 P.3d 974, 981 (2006) (internal brackets and citations omitted).

## D.  Plain error

"We may recognize plain error when the error committed affects substantial rights of the defendant."  State v. Hauge, 103 Hawaiʻi 38, 48, 79 P.3d 131, 141 (2003) (internal citations and quotation marks omitted); see also Hawaiʻi Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

### IV.  Discussion

## A.  Martin's right to testify was not violated based on the Tachibana colloquy

In his first issue on certiorari, Martin argues that the circuit court's colloquy regarding his waiver of his right to testify was deficient as a matter of law.

Our law protects both the right to testify and the right not to testify.  State v. Celestine, 142 Hawaiʻi 165, 169, 415 P.3d 907, 911 (2018).  Tachibana v. State, 79 Hawaiʻi 226, 900 P.2d 1293 (1995), established the requirement that when a defendant in a criminal case indicates an intention not to testify, the trial court must advise the defendant of the right to testify and must obtain an on-the-record waiver of the right.  79 Hawaiʻi at 236, 900 P.2d at 1303.  We stated that this

25

advisement should consist of informing the defendant (1) that they[8] have a right to testify, (2) that if they want to testify, no one can prevent them from doing so, and (3) that if they testify, the prosecution will be allowed to cross-examine them. 79 Hawai‘i at 236 n.7, 900 P.2d at 1303 n.7. We also stated that in connection with the privilege against self-incrimination, the defendant should also be advised (4) that they have a right not to testify and (5) that if they do not testify, then the jury can be instructed about that right. Id. (citations omitted). In a bench trial, defendants must be advised that if they exercise their right not to testify, no inference of guilt may be drawn for exercising this right, i.e., that a decision not to testify cannot be used against a defendant by the judge in deciding the case. State v. Monteil, 134 Hawai‘i 361, 371-72, 341 P.3d 567, 577-78 (2014).

After Tachibana, we also held that a second component of the Tachibana colloquy involves the court engaging in a true "colloquy" with the defendant. Celestine, 142 Hawai‘i at 170, 415 P.3d at 912, citing State v. Han, 130 Hawai‘i 83, 90-91, 306 P.3d 128, 135-36 (2013). This requires "a verbal exchange between the judge and the defendant 'in which the judge

---

[8]    "They, them, and their" are used as singular pronouns when the gender identity of the person referred to is unknown or immaterial.

ascertains the defendant's understanding of the proceedings and of the defendant's rights.'" Celestine, 142 Hawai'i at 170, 415 P.3d at 912 (citing Han, 130 Hawai'i at 90, 306 P.3d at 135 (emphasis omitted)).

To accomplish the purposes of a true colloquy, we suggested that the trial court engage in a verbal exchange with the defendant at least twice during the colloquy in order to ascertain the defendant's "understanding of significant propositions in the advisement." Han, 130 Hawai'i at 90, 306 P.3d at 135. We suggested the first verbal exchange occur after the court informs the defendant of the right to testify and of the right not to testify and the protections associated with these rights, to obtain an affirmative or negative response as to the defendant's understanding of these principles. 130 Hawai'i at 90-91, 306 P.3d at 135-36. We also suggested a second verbal exchange after a defendant informs the court that the defendant does not intend to testify. 130 Hawai'i at 91, 306 P.3d at 136. We stated that as part of this inquiry, the trial court should elicit responses as to whether the defendant intends to not testify, whether anyone is forcing the defendant not to testify, and whether the decision to not testify is the

defendant's.  Celestine, 142 Hawai'i at 170-71, 415 P.3d at 912-13.[9]

A defendant's right to testify is violated when the colloquy does not establish "an objective basis for finding that [the defendant] knowingly, intelligently, and voluntarily gave up" their right to testify.  Han, 130 Hawai'i at 91, 306 P.3d at 136.  Courts look to the totality of the facts and circumstances to determine whether a waiver of the right to testify was voluntarily and intelligently made.  130 Hawai'i at 89, 306 P.3d at 134.

Applying these principles to this case, prior to the close of Martin's case, the following colloquy took place:

> THE COURT: Okay.  So you are Keaka Martin?
> THE DEFENDANT: Yes.
> THE COURT: Okay.  Are you thinking clearly?
> THE DEFENDANT: Yes.
> THE COURT: Are you presently sick?
> THE DEFENDANT: No.
> THE COURT: Within the past 48 hours have you taken any pills, drugs, medication, or drank any alcohol?
> THE DEFENDANT: Um, ibuprofens.
> THE COURT: Okay.  You're suffering from pain?
> THE DEFENDANT: Yes.
> THE COURT: Okay.  Despite your pain and the medication, are you able to think clearly now?
> THE DEFENDANT: Yes.
> THE COURT: Okay.  As I discussed with you before the start of the trial, or at the start of the trial, you have the constitutional right to testify in your own defense.  Although you should consult with your lawyer regarding the decision to testify, it is your decision and no one can prevent you from testifying should you choose to do so.  If

_____

[9]    In State v. Torres, 144 Hawai'i 282, 439 P.3d 234 (2019), decided after the Tachibana colloquy at issue here, we further "h[e]ld that trial courts are required to engage in an on-the-record colloquy with a defendant when the defendant chooses to testify to ensure that a waiver of the right not to testify is knowing, intelligent, and voluntary."  144 Hawai'i at 294-95, 439 P.3d at 246-47.

28

> you decide to testify, the prosecution will be allowed to
> cross-examine you. You also have a constitutional right
> not to testify and to remain silent. If you choose not to
> testify, the jury will be instructed that it cannot hold
> your silence against you in deciding your case. Did you
> understand what I had to say?
> THE DEFENDANT: Yes.
> THE COURT: I have been advised by your lawyer that you do
> not intend to testify in regard to this case; is this true?
> THE DEFENDANT: Yes.
> THE COURT: And is it your decision not to testify?
> THE DEFENDANT: Yes, it is.
> THE COURT: Mr. Strauss, you're -- are you going to suggest
> any more questions of Keaka?
> MR. STRAUSS: No, Your Honor.
> THE COURT: In this area? No? Okay. How about the State?
> MS. NAGATA: No, Your Honor.

Martin argues that this was not a "true colloquy" because the court recited a "litany of rights" without obtaining a response as to Martin's understanding of the fundamental principles pertaining to his rights, and because evidence of Martin's mental illness was a salient fact in this case. Martin compares the colloquy in his case to the colloquy we held deficient in State v. Pomroy, 132 Hawai'i 85, 319 P.3d 1093 (2014).

In Pomroy, we held that the trial court's failure to engage in a true colloquy to "ascertain the defendant's understanding of the individual rights comprising the Tachibana colloquy results in the failure to 'ensure that [the defendant] understood his rights [and] amounts to a failure to obtain the on-the-record waiver required by Tachibana.'" Pomroy, 132 Hawai'i at 93, 319 P.3d at 1101 (quoting Han, 103 Hawai'i at 91,

306 P.3d at 136). In Pomroy, the court provided the following

Tachibana colloquy:

> THE COURT: Alright. Mr. Pomroy, before your attorney
> [rests the defense's case], let me advise you. You have
> the right to testify on your own behalf. That decision is
> yours and yours alone. If you choose to testify you will
> be subject to cross-examination by the state. If you
> choose not to testify, I cannot hold that against you. But
> the only evidence I will have is what the State has
> presented, unless you have other witnesses; you understand
> that?
> THE DEFENDANT: Yes, ma'am.

132 Hawai'i at 92, 319 P.3d at 1100 (alterations in original).

In Pomroy, we held that, in addition to failing to advise

the defendant that he had the right not to testify and that no

one could prevent him from testifying, the court did not engage

in a true colloquy, but recited a "litany of rights." Id. We

noted that, after reciting this litany of rights, the court only

asked Pomroy if he "understood that," and it was unclear which

right "that" referenced. Id.

As compared to Pomroy, in this case, the circuit court also

advised Martin that he had the right not to testify and that no

one could prevent him from testifying. In addition, the circuit

court engaged in a verbal exchange with Martin at least twice

during the colloquy in order to ascertain his "understanding of

significant propositions in the advisement[,]" as suggested by

Han, 130 Hawai'i at 90, 306 P.3d at 135 (citation omitted). The

circuit court engaged in a verbal exchange with Martin after

informing him of the right to testify and the right not to

30

testify and of the protections associated with these rights.  The circuit court also engaged in a second verbal exchange after it indicated to Martin its understanding that he did not intend to testify.  Although the circuit court did not ask Martin whether anyone was forcing him not to testify, it engaged in a third exchange with Martin, asking him if it was his decision not to testify.  Thus, although the circuit court did not the use precise terminology, "Is anyone forcing you not to testify?" the circuit court's questioning was tantamount to eliciting that information.[10]

We do express concern regarding part of the ICA's analysis of the adequacy of Martin's Tachibana colloquy.  In Han, we held that "'[s]alient facts,' such as mental illness or language barriers, require that a court effectively engage the defendant in a dialogue that will effectuate the rationale behind the colloquy and the on-the-record waiver requirements as set forth in Tachibana."  130 Hawai'i at 92, 306 P.3d at 137 (citation omitted).  The ICA determined that Martin's "impaired mental faculties" did not require the court to make "additional efforts to ensure that [Martin] understood his Tachibana rights" in part because Martin was deemed competent and fit to proceed to trial. Martin, SDO at 12.

---

[10]    Trial judges should, however, include this specific question in their colloquies.

31

Although the fact that a person is "competent and fit to proceed" does not necessarily mean that the person's waiver is "voluntary and intelligent," under the totality of circumstances in this case, we hold the circuit court's Tachibana colloquy provides "an objective basis for finding that [Martin] knowingly, intelligently, and voluntarily gave up" his right to testify. Han, 130 Hawai'i at 91, 306 P.3d at 136. In addition to following the requirements of Tachibana, Han, and Celestine, the circuit court asked various questions with regard to the clarity of Martin's state of mind at the time of the colloquy. Thus, under the totality of circumstances, the ICA did not err in holding that the circuit court did not violate Martin's constitutional right to testify by failing to conduct a proper Tachibana colloquy.

**B.  Evidence of Martin's suicide attempt was properly admitted as relevant to his identify as the perpetrator of the crimes charged**

**1.  Background**

In his second question on certiorari, Martin contends the ICA erred in holding that evidence of Martin's suicide attempt was admissible. In his motion in limine #2 before the circuit court, Martin argued that the evidence of his self-inflicted gunshot wound was a specific instance of conduct inadmissible under HRE Rule 404(b) and that the evidence would result in excessive prejudice against him pursuant to HRE Rule 403 (1980).

The State argued in opposition that evidence of Martin's self-inflicted gunshot wound was admissible under HRE Rule 404(b) as relevant and probative of identity, opportunity, intent, knowledge, and absence of mistake or accident.  On appeal, the State also argued that the evidence that Martin shot himself was necessary to "give context to the manner in which the gun was recovered."

At the hearing on the motion in limine #2, the circuit court sua sponte proposed that the evidence of Martin's suicide attempt was also relevant to Martin's consciousness of guilt, citing an ALR article.[11]  In its written order denying Martin's motion, the circuit court concluded that evidence of Martin's suicide attempt was relevant and probative of Martin's consciousness of guilt and also that Martin's self-inflicted gunshot wound was relevant as to identity.

HRE Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.  In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

---

[11]     See Gilsinger, supra note 5.

33

According to the commentary for HRE Rule 404(b), "[w]hen offered for the specified purposes other than mere character and propensity . . . 'other crimes, wrongs, or acts' evidence may be admissible provided the Rule 403 test is met."  HRE Rule 404 cmt.

2.   **Relevance of suicides and attempted suicides as evidence of consciousness of guilt**

Although the State never argued on appeal that Martin's suicide attempt was relevant as consciousness of guilt, expressing agreement with the circuit court, the ICA held that the evidence of Martin's suicide attempt was also relevant as evidence of consciousness of guilt.  Martin, SDO at 9-10.  We therefore preliminarily address the issue of whether evidence of a suicide or a suicide attempt is relevant as evidence of consciousness of guilt.

A court's determination that evidence is "relevant" within the meaning of HRE Rule 401 is reviewed under the right/wrong standard of review.  State v. Lavoie, 145 Hawai'i 409, 422, 453 P.3d 229, 242 (2019) (citation omitted).  In determining that the evidence of Martin's suicide attempt was relevant as consciousness of guilt, the circuit court compared the probative value of a suicide attempt to the probative value of evidence of

flight.[12]  However, there are many reasons why someone might attempt suicide.  Mental disorders, alcohol and other substance use disorders, and previous suicide attempts are recognized risk factors indicating that a person is more likely to attempt suicide.[13]

The history of suicide evidence as relevant of consciousness of guilt in American law has actually been traced to an argument made by Daniel Webster.  Arguing for the prosecution in the trial of Commonwealth v. Knapp, 26 Mass. 496 (1830), Webster asserted that suicide was the equivalent of a confession, stating:

> Meantime the guilty soul cannot keep its secret . . . . It betrays his discretion, it breaks down his courage, it conquers his prudence.  When suspicions from without begin to embarrass him, and the net of circumstances to entangle him, the fatal secret struggles with still greater violence to burst forth.  It must be confessed!  It WILL be confessed!  There is no refuge from confession, but suicide,—and suicide is confession.

Mann, 625 A.2d at 1107 (quoting Commonwealth v. Knapp, 7 American State Trials 395 (1830)) (ellipsis and emphasis in original).  Apparently following Webster's logic, a majority of U.S. courts have since then held that evidence of suicide and

---

[12]    Although many years ago, this court suggested that flight evidence could be an indicator of consciousness of guilt.  See Territory v. Corum, 34 Haw. 167, 189 (Haw. Terr. 1937) (Peters, J., dissenting).  More recently, we have questioned the relevance of flight evidence as an indicator of guilt.  See State v. Heapy, 113 Hawai'i 283, 294, 151 P.3d 764, 775 (2007).

[13]    We Can All Prevent Suicide, Suicide Prevention Lifeline, https://perma.cc/9QUE-6PB7.

attempted suicide is admissible as relevant to a defendant's consciousness of guilt, often analogizing suicide evidence to flight evidence.[14]  Scholarship from as early as the 1950s, however, called into question the relevance of a suicide attempt as consciousness of guilt.[15]  A 1964 Note observed that "[p]sychologists rarely find that an attempted suicide was motivated by a sense of conscious guilt in connection with a crime," and that studies had failed to find a connection between an attempted suicide and a criminal act.[16]  In addition, more recently, state courts of last resort have questioned the probative value of suicide evidence as to consciousness of guilt.  In State v. Mann, the New Jersey Supreme Court recognized that, aside from guilt, other factors such as "a defendant's psychological, social or financial situation may underlie a suicide attempt."  625 A.2d at 1108.  The New Jersey Supreme Court held that trial courts should hold hearings to "determine whether evidence of a defendant's suicide attempt is sufficient to support a reasonable inference that the suicide

---

[14]    See Gilsinger, supra note 5.

[15]    See The Judicial Interpretation of Suicide, 105 U. PA. L. REV. 391 (1957); Note, Attempted Suicide as Evidence of Guilt in Criminal Cases: The Legal and Psychological Views, 1964 WASH. U. L. Q. 2014.

[16]    Attempted Suicide as Evidence of Guilt in Criminal Cases, supra note 15, at 207.

attempt was . . . evidence of consciousness of guilt." Id.[17] Similarly, the Vermont Supreme Court has cautioned that "[t]he underlying reasons motivating an attempt to take one's life can be both numerous and highly complex . . . ." Onorato, 762 A.2d at 859-60.

We reject the majority rule that evidence of suicides and attempted suicides are automatically admissible as relevant to a defendant's consciousness of guilt. We agree with the Vermont Supreme Court that "[t]he underlying reasons motivating an attempt to take one's life can be both numerous and highly complex . . . ." Onorato, 762 A.2d at 859-60. We also agree with the New Jersey Supreme Court that, aside from guilt, other factors such as "a defendant's psychological, social or financial situation may underlie a suicide attempt." Mann, 625 A.2d at 1108.

Therefore, we hold that when evidence of a suicide or suicide attempt is proffered as evidence of consciousness of guilt, the proponent must establish a foundation for the evidence's admission for this purpose pursuant to HRE Rule 104 (1984).[18] In a criminal case, if such evidence is being offered

---

[17] But see text accompanying note 19, infra. We require an evidentiary foundation that a suicide or suicide attempt constitutes "consciousness of guilt," which requires that foundation be established by a "preponderance of evidence," not by a "reasonable inference."

[18] HRE Rule 104 reads in relevant part:

(continued. . .)

against the defendant, "[t]he trial court also should ensure that a defendant has been given adequate notice of the State's intention to offer proof of the attempted suicide." Mann, 625 A.2d at 1108.

In addition, in determining whether a sufficient foundation exists for admission of a suicide or suicide attempt as relevant of consciousness of guilt, as explained in Addison M. Bowman, Hawaii Rules of Evidence Manual 1-15 (2018-19 ed.) ("Bowman"), in State v. McGriff, 76 Hawai'i 148, 871 P.2d 782 (1994), this court "adopted the preponderance of the evidence standard for foundation factfinding in [HRE R]ule 104(a) admissibility hearings, citing Bourjaily v. United States, 483 U.S. 171, 175

(a) Questions of admissibility generally. Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.
(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
(c) Hearing of jury. Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if the accused so requests.
(d) Testimony by accused. The accused does not, by testifying upon a preliminary matter, subject oneself to cross-examination as to other issues in the case.
(e) Weight and credibility. This rule does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.

(1987)."[19]  Thus, to establish the requisite foundation for relevance under HRE Rule 104(a), a trial court must determine that, by a preponderance of the evidence, the suicide or suicide attempt constitutes evidence of a consciousness of guilt, while also "consider[ing any] alternative explanations of the suicide attempt offered by a defendant."  Mann, 625 A.2d at 1108. Further, assuming relevance is found to exist under HRE Rule 104(a), but the relevance is conditioned upon the existence of another fact, such as the existence of an alleged suicide note, then HRE Rule 104(b) also applies.

Even if the trial court determines that the requisite foundation for admissibility exists, the trial court must still conduct an HRE Rule 403 balancing analysis.  See Section IV.B.4, infra; see also, Mann, 625 A.2d at 1108 ("The court should consider . . . the possible prejudice to a defendant from the introduction of the attempted suicide evidence or from a defendant's effort to offer a different explanation of that evidence.").

---

[19]    As further stated by Professor Bowman:

> This standard of proof for evidence foundations applies in civil and criminal proceedings.  The burden of proof of preliminary facts is placed on the proponent of the evidence except when privilege is the issue, in which event the party asserting the privilege bears the burden of proof of the privilege foundation.

Bowman, at 1-15.

### 3. Martin's suicide attempt was admissible as relevant to identity

Although the circuit court and ICA erred in determining that evidence of Martin's self-inflicted gunshot wound was admissible as showing his consciousness of guilt, the circuit court also ruled that, as argued by the State, Martin's self-inflicted gunshot wound was relevant as to his identity as the perpetrator of the offenses charged. The State argued that the evidence that Martin shot himself was necessary to "give context to the manner in which the gun was recovered." On certiorari, Martin argues that his history of mental illness, prior suicide attempts, fear of the police, and abnormal paranoid behavior renders the probative value of his suicide attempt to show consciousness of guilt "minimal at best." Under the circumstances of this case, however, we hold that, as alternatively concluded by the circuit court, evidence of Martin's suicide attempt was relevant to his identity as the possessor of the firearm that discharged the eight casings recovered from Maile Street and the three casings found beneath the black vehicle at Pono Place. During closing argument, Martin strongly contested that he was the person that had committed the offenses charged. Therefore, the evidence that Martin shot himself with the firearm used in the offenses the next day and that the police through remote control saw Martin

lying on his back with the firearm next to him was relevant to identifying Martin as the person who had possessed and discharged the same firearm the day before.

### 4.    HRE Rule 403 analysis

Even if evidence of a suicide or attempted suicide is determined to be relevant, a trial court must also engage in an HRE Rule 403 balancing analysis.  Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  The balance between the evidence's probative value and prejudicial effect is "predicated upon an assessment of 'the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility.'"  State v. Uyesugi, 100 Hawaiʻi 442, 463, 60 P.3d 843, 864 (2002).

Martin argues that the trial judge did not properly consider the highly prejudicial nature of the attempted suicide evidence, and that the evidence of the gun and casings found near him could have been elicited without discussion of his suicide attempt.  We agree that the evidence of Martin's suicide attempt was prejudicial; like the circuit court, it is possible

41

that jurors may have assumed that the suicide evidence indicated consciousness of guilt.[20]

The record does not show that the court meaningfully considered the prejudicial effect of Martin's suicide attempt. Although the circuit court did not appear to have conducted an HRE Rule 403 analysis, under the circumstances, the probative value of Martin's suicide attempt as to his identity as the perpetrator of the offenses was not substantially outweighed by its prejudicial effect, especially because Martin strongly argued mistaken identity.

### 5. Limiting instruction

Martin alternatively argues that, if the evidence of his suicide attempt was properly admitted, the circuit court should have at least <u>sua</u> <u>sponte</u> provided the jury with a cautionary instruction about the limited admissibility of Martin's suicide attempt. Specifically, Martin argues that the circuit court

---

[20] In addition, suicide was a felony at common law and was sometimes considered "self-murder." <u>See</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 710-17 (1997) (summarizing the Anglo-American common law tradition of criminalizing suicide). As an editorial published by the Centre for Suicide Prevention points out, contemporary language used to discuss suicide still reflects suicide's historic criminality, as the phrase to "commit" suicide "equates the act with homicide or fratricide, and suggests that it is akin to 'self-murder.'" Robert Olson, <u>Suicide and Stigma</u>, Centre for Suicide Prevention, https://perma.cc/B4LZ-WZL3. Suicide has also been mistakenly associated with cowardice. <u>See</u> <u>Glucksberg</u>, 521 U.S. at 712 (quoting Blackstone's Commentaries as referring to suicide as "the pretend heroism, but real cowardice, of the Stoic philosophers, who destroyed themselves to avoid those ills which they had not the fortitude to endure").

should have given Hawai'i Jury Instructions—Criminal ("HAWJIC")

2.03 concerning "Other Crimes, Wrongs or Acts."[21]

Under HRE Rule 105 (1980), "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."  Martin did not request a cautionary instruction at trial.  Under the circumstances of this case, as the failure to give a cautionary instruction did not amount to plain error affecting substantial rights, there was no error based on the circuit court not sua

---

[21]    HAWJIC 2.03 reads:

> You [are about to hear] [have heard] evidence that the Defendant at another time, may have [engaged in] [committed] other [crimes] [wrongs] [acts].  This evidence, if believed by you, may be considered only on the issue of Defendant's [motive to commit the offense charged] [opportunity to commit the offense charged] [intent to commit the offense charged] [preparation to commit the offense charged] [plan to commit the offense charged] [knowledge (specify knowledge required to commit the offense charged] [identity as the person who committed the offense charged] [modus operandi] [alleged conduct having resulted from a mistake or accident].  Do not consider this evidence for any other purpose.  You must not use this evidence to conclude that because the Defendant at another time may have [engaged in] [committed] other [crimes] [wrongs] [acts] that [they are] a person of bad character and therefore must have committed the offense[s] charged in this case.
>
> In considering the evidence for the limited purpose for which it has been received, you must weigh it in the same manner as you would all other evidence in this case, and consider it along with all other evidence in this case.

sponte providing the jury with HAWJIC 2.03, "Other Crimes, Wrongs or Acts."

Martin argues that we should adopt a rule similar to that in Mann requiring courts to provide a cautionary instruction "in all cases where evidence of [a] Defendant's attempt at suicide is elicited."[22]  Given what appear to be common misconceptions regarding suicide or attempted suicides as consciousness of guilt and the potential prejudicial nature of suicide evidence, trial courts should provide a limiting instruction as appropriate under the facts of a case when evidence of an attempted suicide is admitted.[23]  Again, under the circumstances of this case, as the failure to give a cautionary instruction did not amount to plain error affecting substantial rights, there was no error requiring vacatur of Martin's convictions.

---

[22]    In Mann, the New Jersey Supreme Court held that if evidence of a defendant's suicide attempt is admitted, the trial court should instruct the jury that "it first must find that an actual suicide attempt had occurred." 625 A.2d at 1108.  Second, the jury "should then consider whether that attempt was made to avoid the burdens of prosecution and punishment."  625 A.2d at 1108-09.  Third, the jury "should also determine whether [the] defendant's attempted suicide demonstrated consciousness of guilt.  The trial court should instruct the jury that if it credits any alternative explanation offered by the defendant, it may not infer consciousness of guilt from the evidence of a suicide attempt."  625 A.2d at 1109.

[23]    We do not hold that all cases with suicide or attempted suicide evidence require a limiting instruction if not requested, but we encourage trial judges to exercise their discretion to fashion limiting instructions as appropriate in the contexts of the cases in which suicide evidence might be admitted.  We also do not adopt the Mann standards for limiting instructions.

**C.    Martin's statement that he shot himself was properly
        admitted as voluntarily made**

In his third question on certiorari, Martin argues that the
ICA gravely erred by not reversing the circuit court's
determination that his "I shot myself" statement was made
voluntarily.  Specifically, Martin argues that his deteriorated
physical condition due to his gunshot wound rendered his
statement involuntary.

"Under the fifth amendment to the United States
Constitution and article 1, section 10 of the Hawaii
Constitution, '[n]o person shall . . . be compelled in any
criminal case to be a witness against [themself]."  State v.
Kelekolio, 74 Haw. 479, 501, 849 P.2d 58, 69 (1993) (quoting
State v. Pau'u, 72 Haw. 505, 509, 824 P.2d 833, 835 (1992)).
"Any waiver of one's constitutional rights must be voluntarily
and intelligently undertaken[.]"  Pau'u, 72 Haw. at 509, 824 P.2d
at 835.  HRS § 621-26 also provides that "[n]o confession shall
be received in evidence unless it is first made to appear to the
judge before whom the case is being tried that the confession
was in fact voluntarily made."

The voluntariness of a defendant's statement is determined
by a totality of the circumstances.  Kelekolio, 74 Haw. at 502,
849 P.2d at 69.  "A defendant's mental and physical condition
can be part of the 'totality of circumstances' relevant to the

issue of the voluntariness of [their] custodial statements." 74 Haw. at 503, 849 P.2d at 69. A confession may be rendered involuntary by "impermissible police conduct." 74 Haw. at 503, 849 P.2d at 70. The burden is on the prosecution to show that a defendant's statement was voluntarily made and not the product of coercion. 74 Haw. at 502, 849 P.2d at 69.

In this case, Martin said, "I shot myself" to the police after suffering a self-inflicted gunshot wound to the abdomen. Although Martin testified that he did not recall making the statement, the hearing indicated the statement was spontaneous and not a product of custodial interrogation or police coercion. Although a defendant's mental and physical condition can be part of the "totality of circumstances" relevant to the issue of the voluntariness of custodial statements, and Martin testified that he did not recall making the statement after he shot himself, under the circumstances of this case, the State met its burden of establishing that Martin's "I shot myself" statement was voluntary under the totality of the circumstances. In any event, even if the statement was improperly admitted as an involuntary statement, any error based on its admission would be harmless beyond a reasonable doubt as there is no reasonable possibility that admission of this statement contributed to Martin's convictions based on the overwhelming additional evidence that Martin had in fact shot himself.

**D.  Evidence of Martin's prior bad acts was properly admitted**

**1.  Background**

In his fourth question on certiorari, Martin argues that the ICA erred by holding the circuit court did not err by admitting testimony of Martin's prior bad acts.  Martin argues that statements made by five witnesses—Sonya Chong, Kawika Paulino, David Carroll, Misty Quiocho, and Darrel Constantino— were improperly admitted under HRE Rule 404(b).

As noted earlier, under HRE Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  However, evidence may be admissible under HRE Rule 404(b) if it is probative of "motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident."  If evidence of prior bad acts is "offered for substantive reasons rather than propensity, a trial court must additionally weigh the potential prejudicial effects of the evidence against its probative value under HRE Rule 403."  State v. Behrendt, 124 Hawai'i 90, 103, 237 P.3d 1156, 1169 (2010).  A trial court's balancing "of such evidence under HRE Rule 403 . . . is reviewed for abuse of discretion." 124 Hawai'i at 115, 237 P.3d at 1181 (quotations omitted).

Although Martin objected to Paulino's testimony as leading and hearsay, to Quiocho's testimony based on exceeding the scope

of his direct examination, and to Constantino's testimony on the basis of improper refreshment, Martin did not object to the challenged testimonies of these five witnesses based on HRE Rule 404(b). Martin also did not challenge any of the testimony based on HRE Rule 403 grounds. Therefore, as did the ICA, we review the challenged testimonies of the five witnesses to determine whether there was plain error affecting Martin's substantial rights.

### 2. Sonya Chong

Martin challenges Chong's testimony that, approximately six months prior to the shooting, Martin possessed a silver and gray hand-held firearm. Chong testified that Martin would practice aiming the firearm while saying "Fuck the cops" and he had said that he would shoot cops with the firearm. Chong's testimony was not offered for the purpose of showing that Martin acted in conformity with his prior acts. Chong's testimony that Martin practiced aiming the firearm while saying "Fuck the cops," and that Martin indicated that he would shoot cops with the firearm was probative of his intent and absence of mistake or accident. In addition, the probative value of Chong's testimony outweighed the danger of unfair prejudicial effect.

Thus, the ICA did not err in concluding there was no plain error affecting Martin's substantial rights as to Chong's testimony.

### 3. Kawika Paulino

Martin challenges Paulino's testimony that earlier in the day on which the officers were shot, Martin told him that he had outstanding warrants, was facing jail time, and would not go to jail without a fight. Paulino's statements regarding Martin's awareness of his warrants and potential jail time were probative of Martin's motive, intent, and state of mind. The probative value of the evidence was not outweighed by its prejudicial effect. Thus, the ICA did not err in concluding there was no plain error affecting Martin's substantial rights as to Paulino's testimony.

### 4. David Carroll

Martin challenges Carroll's testimony that, after about 7:00 p.m. on January 2, 2013, about an hour before the officers were shot, Martin asked him if he could "pop off some rounds," shot rounds into the air, and said, "Fuck the police." The challenged evidence was probative of Martin's state of mind and also suggests that Martin did not shoot Officers Gouveia and Hatada by mistake or accident. The probative value of the evidence was not outweighed by its prejudicial effect. Thus, the ICA did not err in concluding there was no plain error affecting Martin's substantial rights as to Paulino's testimony.

49

### 5. Misty Quiocho

Martin challenges Quiocho's cross-examination testimony elicited by the State that Martin was avoiding the police because he had a warrant. Martin objected to this testimony on the grounds that it exceeded the scope of direct examination, but the State elicited this testimony in response to Quiocho's direct testimony that Martin was fearful of and tried to avoid the police. Quiocho was Martin's girlfriend for several years up to the date of the offenses, and her testimony about Martin avoiding the police was probative of Martin's state of mind. Also, its probative value was not substantially outweighed by its prejudicial effect. Even if Martin had objected to this testimony on HRE Rule 403 grounds based on it being cumulative, which it may have been, reviewing the admission of this testimony under the plain error standard, Martin's substantial rights were not violated. Therefore, the ICA did not err in concluding there was no plain error affecting Martin's substantial rights as to Quiocho's testimony.

### 6. Darrel Constantino

Martin challenges Constantino's testimony that, on the evening of January 2, 2013, prior to the shooting, Martin said, "Fuck the cops." Constantino's testimony was probative of Martin's intent and state of mind, and his testimony also suggests that Martin did not shoot Officers Gouveia and Hatada

50

by mistake or accident.  Its probative value was not substantially outweighed by its prejudicial effect.  Martin objected to this testimony on the basis of improper refreshment.  Even if Martin had objected on HRE Rule 403 grounds based on it being cumulative of Carroll's testimony, which it may have been, reviewing the admission of this testimony under the plain error standard, Martin's substantial rights were not violated.  Therefore, the ICA did not err in concluding there was no plain error affecting Martin's substantial rights as to Constantino's testimony.

**E.    The circuit court did not err with respect to lesser-included offense instructions**

**1.    Background**

In his last question on certiorari, Martin argues that the jury should have been instructed on various lesser-included offenses for both Count 1 regarding Officer Hatada and Count 4 regarding Officer Gouveia.

"[J]ury instructions on lesser-included offenses must be given when there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."  State v. Flores, 131 Hawai'i 43, 51, 314 P.3d 120, 128 (2013).  An offense is included when:

> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

> (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
> (c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

HRS § 701-109 (Supp. 1984).

In Count 1, Martin was charged with attempted murder in the first degree of Officer Hatada.  The jury was instructed on the lesser-included offenses of attempted murder in the second degree, assault in the first degree, assault in the second degree, assault against a law enforcement officer in the first degree, assault against a law enforcement officer in the second degree, and reckless endangering in the first degree.  Martin was convicted in Count 1 of the lesser-included offense of assault in the first degree.  Martin argues that the circuit court should have also instructed the jury on attempted assault in the first degree,[24] attempted assault against a law enforcement officer in the first degree,[25] attempted assault in

---

[24]     A person commits assault in the first degree "if the person intentionally or knowingly causes serious bodily injury to another person." HRS § 707-710 (Supp. 1986).

[25]     A person commits assault against a law enforcement officer in the first degree if the person "[i]ntentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty; or . . . [r]ecklessly or negligently causes, with a dangerous instrument, bodily injury to a law enforcement officer who is engaged in the performance of duty."  HRS § 707-712.5 (Supp. 2003).

the second degree,[26] assault in the third degree,[27] and reckless endangering in the second degree.[28]

In Count 4, Martin was charged with and convicted of attempted murder in the first degree as to Officer Gouveia. The jury was also instructed on attempted murder in the second degree, assault in the first degree, attempted assault in the first degree, assault in the second degree, assault against a

---

[26] HRS § 707-711 (Supp. 2011), "Assault in the second degree," provides in relevant part,

> A person commits the offense of assault in the second degree if:
>     (a) The person intentionally or knowingly causes substantial bodily injury to another; [or]
>     (b) The person recklessly causes serious or substantial bodily injury to another."
>     . . . .

[27] HRS § 707-712 (Supp. 1984), "Assault in the third degree," provides in relevant part:

> (1) A person commits the offense of assault in the third degree if the person:
>     (a)   Intentionally, knowingly, or recklessly causes bodily injury to another person; or
>     (b)   Negligently causes bodily injury to another person with a dangerous instrument.

[28] HRS § 707-714, "Reckless endangering in the second degree," provides in relevant part:

> (1)  A person commits the offense of reckless endangering in the second degree if the person:
>     (a)  Engages in conduct that recklessly places another person in danger of death or serious bodily injury; or
>     (b)  Intentionally discharges a firearm in a populated area, in a residential area, or within the boundaries or in the direction of any road, street, or highway; provided that the provisions of this paragraph shall not apply to any person who discharges a firearm upon a target range for the purpose of the target shooting done in compliance with all laws and regulations applicable thereto.

law enforcement officer in the first degree, assault against a law enforcement officer in the second degree, attempted assault against a law enforcement officer in the first degree, and reckless endangering in the first degree. Martin argues, however, that the court should have also instructed the jury on attempted assault in the second degree, assault in the third degree, and reckless endangering in the second degree.

Martin's assertions are without merit because there was no rational basis in the evidence to acquit Martin of the charges for which he was convicted in Counts 1 and 4 and to instead convict him of these lesser-included offenses. Also, with respect to Count 1, the only evidence of shots fired in Officer Hatada's direction was the shot that struck Officer Hatada in the leg. In addition, there was no evidence to suggest that both officers were not law enforcement officers engaged in the performance of duty when they were shot.

Therefore, the circuit court did not err in failing to give required lesser-included instructions.

## F.    The circuit court should have given a merger instruction

Finally, although not raised as an issue on appeal, we note that in addition to his convictions in Counts 3 (Officer Hatada) and 6 (Officer Gouveia) for carrying or use of a firearm in the commission of a separate felony in violation of HRS

54

§ 134-21(a),[29] Martin was also convicted of ownership or possession prohibited of any firearm or ammunition by a person charged with or convicted of certain crimes in violation of HRS § 134-7(b)[30] in Count 7, carrying or possessing a loaded firearm on a public highway in violation of HRS § 134-26(a)[31] in Count 8, and place to keep pistol or revolver in violation of HRS § 134-25(a)[32] in Count 9. Counts 7, 8, and 9 were all charged as having occurred on January 2, 2013. Plain error or defects

---

[29] HRS § 134-21 provides in relevant part as follows:

> (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not;
> . . . .
> (b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.

[30] HRS § 134-7(b) provides in relevant part:

> No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

[31] HRS § 134-26(a) provides in relevant part:

> It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; . . . .

[32] HRS § 134-25(a) provides:

> (a) Except as provided in sections 134-5 and 134-9, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be
> (continued. . .)

affecting substantial rights may be noticed although they were not brought to the attention of the court.

In Lavoie, 145 Hawai'i 409, 453 P.3d 229, consistent with our prior holding in State v. Matias, 102 Hawai'i 300, 75 P.3d 1191 (2003), we stated:

> Generally, when the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. HRS § 701-109(1) (1993). A defendant may not, however, be convicted of more than one offense if the offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses. HRS § 701-109(1)(e). Thus, this court has concluded that only one crime is committed when (1) there is but one intention, one general impulse, and one plan, (2) the two offenses are part and parcel of a continuing and uninterrupted course of conduct, and (3) the law does not provide that specific periods of conduct constitute separate offenses.
>
> . . . .
>
> The test for whether a crime can be charged as a continuous offense is whether the statute precludes charging an offense as a continuous offense, and whether the element(s) of the offense may constitute a continuous, unlawful act or series of acts, however long a time the act or acts may occur.

---

lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:
(1) A place of repair;
(2) A target range;
(3) A licensed dealer's place of business;
(4) An organized, scheduled firearms show or exhibit;
(5) A place of formal hunter or firearm use training or instruction; or
(6) A police station.
"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

> If the statute provides that distinct acts constitute separate offenses, then conduct may not be charged as a continuous offense . . . .
>
> In State v. Matias, the defendant was convicted of felon in possession and place to keep. We vacated the defendant's convictions because the circuit court failed to provide a merger instruction to the jury. As we would later explain, both offenses arose out of the same elemental conduct, i.e., what the defendant did with the object, namely, possessed it.
>
> Accordingly, in vacating the felon in possession and place to keep convictions and remanding for a new trial for failure to instruct the jury on merger, the Matias court concluded that these statutes did not preclude the charging of these offenses as continuous offenses. Implicit in the court's holding was the conclusion that the statutes are comprised of elements--namely, the element of possession-- that may extend beyond isolated moments.
>
> . . . .
>
> Here, Lavoie was also convicted for violating the felon in possession (HRS § 134-7(b)) and place to keep (HRS § 134-23(2)) statutes, neither of which excludes charging the offense as continuous . . . .
>
> Thus, the offenses of felon in possession and place to keep may be charged as continuous offenses, and the jury was required to determine whether there was one intention, one general impulse, and one plan, and whether the two offenses merged.
>
> . . . .
>
> Here, both the felon in possession and place to keep offenses were charged as having occurred on the same date, and the court's instructions on the elements of these offenses specified that date. Whether Lavoie's conduct constituted "separate and distinct culpable acts or an uninterrupted continuous course of conduct" was a question of fact that was required to be determined by the jury. And, the jury should also have been required to determine whether Lavoie had one intention, one general impulse, and one plan to commit both offenses. The circuit court's failure to instruct the jury to make these determinations was prejudicial and plainly erroneous.

Lavoie, 145 Hawai'i at 251-53, 453 P.3d at 431-33 (citations, parentheticals, brackets, quotation marks, emphases, and footnotes omitted.).

Thus, consistent with <u>Matias</u>, <u>Lavoie</u> held that although a defendant can be <u>charged</u> with both ownership or possession prohibited of any firearm or ammunition by a person charged with or convicted of certain crimes in violation of HRS § 134-7(b) as well as place to keep pistol or revolver in violation of HRS § 134-25(a), as these offenses can be charged as continuous offenses, a jury must determine whether "there was one intention, one general impulse, and one plan, and whether the two offenses merged[;]" if so, a defendant could only be <u>convicted</u> of one of the two charged offenses pursuant to HRS § 701-109(1)(e) (Supp. 1984), which provides:

> (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if: . . .
> (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

In other words, HRS § 701–109(1)(e) interposes a constraint on multiple convictions arising from the same criminal conduct. <u>Matias</u>, 102 Hawai'i at 305, 75 P.3d at 1196. The statute "reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal[.]" <u>See</u> HRS § 701–109 cmt.; <u>State v. Deguair</u>, 139 Hawai'i 117, 128, 384 P.3d 893, 904 (2016).

In Martin's case, the State argued slightly different time periods of possession on January 2, 2013 for Counts 7 and 9.[33] Based on Matias, however, which preceded Martin's trial, as Count 7, ownership or possession prohibited of any firearm or ammunition by a person charged with or convicted of certain crimes in violation of HRS § 134-7(b), and Count 9, place to keep pistol or revolver in violation of HRS § 134-25(a), could be charged as continuing offenses, and "both offenses arose out of the same elemental conduct, i.e., what the defendant did with the object, namely, possessed [the firearm,]" Martin was clearly entitled to a merger instruction. Lavoie, 145 Hawai'i at 252, 453 P.3d at 432 (internal quotation marks omitted). Pursuant to Matias, it was for the jury to determine whether there was one intention, one general impulse, and one plan, and whether the offenses merged.

In addition, in this case, Martin was also charged and convicted in Count 8 of carrying or possessing a loaded firearm on a public highway in violation of HRS § 134-26(a). Martin's conviction on this offense while also being convicted of Counts

---

[33] In closing argument, the State argued that Count 7, ownership or possession prohibited of any firearm or ammunition by a person charged or convicted of certain crimes in violation of HRS § 134-7(b), was based on Martin's possession and shooting of the firearm on Maile Street. The State argued that Count 9, place to keep pistol or revolver in violation of HRS § 134-25(a), was based on Martin carrying the firearm at Pono Place as well as additional areas.

7 and 9 also implicates HRS § 701-109(1)(e) because, likewise, this "offense is defined as a continuing course of conduct" and does not "provide[] that specific periods of conduct constitute separate offenses."[34]  Thus, in this case, for Counts 7, 8, and 9, Martin was entitled to a merger instruction, and it was for the jury to determine whether there was one intention, one general impulse, and one plan, and whether the offenses merged.[35]

Although there was no merger instruction, a new trial on Counts 7, 8, and 9 is not required.  Pursuant to State v. Padilla, 114 Hawai'i 507, 164 P.3d 765 (App. 2007), the State has the option of dismissing two of the three charges and maintaining the judgment of conviction and sentence on one charge.[36]  Padilla, 114 Hawai'i at 517, 164 P.3d at 775.

### V.  Conclusion

Based on the reasoning above, we vacate the ICA's July 9, 2019 judgment on appeal affirming the circuit court's August 5, 2014 judgment of conviction and sentence as to Counts 7, 8, and

---

[34]  With respect to Count 8, carrying or possessing a loaded firearm on a public highway in violation of HRS § 134-26(a), the State argued that the charge was based on Martin walking on Kilauea Avenue from the field to Pono Place after shooting the firearm and reloading it with another magazine.

[35]  The record does not reflect a request for or discussion of a merger instruction.

[36]  As noted earlier, the circuit court sentenced Martin to five years on Count 7, ten years on Count 8, and ten years on Count 9, with the sentences for Counts 7, 8, and 9 to be served concurrently.  Thus, the lack of a merger instruction does not affect the maximum sentence for Martin's conviction on these three charges.

9 only, and remand Counts 7, 8, and 9 to the circuit court for further proceedings consistent with this opinion.  We otherwise affirm the ICA's July 9, 2019 judgment on appeal affirming the circuit court's August 5, 2014 judgment of conviction and sentence.

Lars Robert Isaacson
for Petitioner

Ricky R. Damerville
for Respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

